BGK:MMO
F. 2022V03577

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,

Plaintiff,

-against-

REAL PROPERTY AND PREMISES KNOWN AS 432 NORTH OAKHURST DRIVE, CONDOMINIUM UNIT 103, BEVERLY HILLS, CALIFORNIA 90210, AND ALL PROCEEDS TRACEABLE THERETO;

REAL PROPERTY AND PREMISES KNOWN AS 432 NORTH OAKHURST DRIVE, CONDOMINIUM UNIT 203, BEVERLY HILLS, CALIFORNIA 90210, AND ALL PROCEEDS TRACEABLE THERETO;

ANY AND ALL FUNDS ON DEPOSIT IN STIFEL NICOLAUS & CO. ACCOUNT NUMBER ENDING IN 9142, HELD IN THE NAME OF 7D BUSINESS BUREAU INC., AND ALL PROCEEDS TRACEABLE THERETO; and

ANY AND ALL FUNDS ON DEPOSIT IN CITIZENS BUSINESS BANK ACCOUNT NUMBER ENDING IN 7135, HELD IN THE NAME OF 7D BUSINESS BUREAU INC., AND ALL PROCEEDS TRACABLE THERETO,

Defendants *In Rem*.

– – – – – – – – – – – – – – – – – – – – – – – – X

**VERIFIED COMPLAINT**
**<u>IN REM</u>**

Civil Action No. 22-CV-7410

Plaintiff, United States of America, by its attorney, BREON PEACE, United States Attorney for the Eastern District of New York, Madeline O'Connor, Assistant United States Attorney, of counsel, alleges upon information and belief as follows:

## NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States the above-captioned defendant properties and all proceeds traceable thereto (collectively, the "Defendants *In Rem*"), including all appurtenances, improvements, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, with respect to the defendant real properties.

2. The Defendants *In Rem* are subject to forfeiture pursuant to: (a) 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property; (b) 18 U.S.C. § 981(a)(1)(C), as property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344, and/or 50 U.S.C. § 1705(a) (International Emergency Economic Powers Act ("IEEPA")), or a conspiracy to commit such offenses; and/or (c) 31 U.S.C. § 5335(e), as property involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, and property traceable thereto.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action commenced by the United States, pursuant to 28 U.S.C. § 1345, and over an action for forfeiture, pursuant to 28 U.S.C. § 1355.

4. Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395 in that the acts and omissions giving rise to the forfeiture accrued in the Eastern District of New York.

## THE DEFENDANTS IN REM

5. The Defendants *In Rem* consist of the following:

(a) The real property and premises known as 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 103");

(b) The real property and premises known as 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 203") ((a) and (b), collectively, the "Defendant Condominiums");

(c) Any and all funds on deposit in Stifel Nicolaus & Co. account number ending in 9142, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto (the "Stifel Account"); and

(d) Any and all funds on deposit in Citizens Business Bank account number ending in 7135, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto (the "Citizens Account") ((c) and (d), collectively, the "Defendant Accounts").

## RELEVANT STATUTES AND REGULATIONS

### A. IEEPA

6. IEEPA (50 U.S.C. § 1701 *et seq.*) grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

**B. Executive Order 13848 and Implementing Regulations**

7. On September 12, 2018, under the authority of IEEPA and other authorities, the President of the United States issued Executive Order 13848 ("E.O. 13848"), declaring a national emergency to deal with the threat posed by foreign interference in United States elections (the "Foreign Interference in U.S. Elections Sanctions"). The President renewed E.O. 13848 on multiple occasions, most recently on September 7, 2022.

8. Section 2(a) of E.O. 13848 provides that "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in" for foreign persons determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Attorney General, and the Secretary of Homeland Security:

> (i) to have directly or indirectly engaged in, sponsored, concealed, or otherwise been complicit in foreign interference in a United States election;
>
> (ii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subsection (a)(i) of this section or any person whose property and interests in property are blocked pursuant to this order; or
>
> (iii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

9. The prohibitions in Section 2 include "(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked"; and "(b) the receipt of any contribution or provision of funds, goods, or services from any such person." Section 5 of E.O. 13848.

10. Section 7 of E.O. 13848 further provides that "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in [EO 13848] is prohibited," as well as "[a]ny conspiracy formed to violate any of the prohibitions set forth in [E.O. 13848]."

11. On April 29, 2019, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") issued the Foreign Interference in U.S. Elections Sanctions Regulations (84 Fed. Reg. 17950), 31 C.F.R. part 579 (the "Regulations") to implement E.O. 13848.

12. The names of the persons designated pursuant to the Foreign Interference in U.S. Elections Sanctions, whose property and interest in property are blocked pursuant to the Regulations, are listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons List ("SDN List").

13. Section 579.203 of the Regulations requires any U.S. person holding funds subject to the Regulations to hold or place such funds in a blocked interest-bearing account located in the United States. It further provides that "[f]unds subject to this section may not be held, invested, or reinvested in a manner that provides financial or economic benefit or access to any [SDN] whose property and interests in property are blocked pursuant to [the Regulations]."

14. Section 579.204 of the Regulations requires that "all expenses incident to the maintenance of tangible property blocked pursuant to § 579.201 shall be the responsibility of the owners or operators of such property, which expenses shall not be met from blocked funds."

15. The Regulations define the following:

(a) "Blocked account" and "blocked property" mean "any account or property subject to the prohibitions in § 579.201 [*i.e.*, prohibited

transactions] held in the name of a person whose property and interests in property are blocked pursuant to § 579.201, or in which such person has an interest, and with respect to which payments, transfers, exportations, withdrawals, or other dealings may not be made or effected except pursuant to a license or other authorization from OFAC expressly authorizing such action." 31 C.F.R. § 579.301.

(b) "Person" means an individual or entity. 31 C.F.R. § 579.309.

(c) "Property" and "Property interest" include, among other things, "money, checks, . . . bank deposits, savings accounts, . . . any other evidences of title, ownership, or indebtedness, . . . powers of attorney, . . . deeds of trust, . . . land contracts, leaseholds, ground rents, real estate and any other interest therein, . . . contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 579.310.

(d) "Transfer" means, *inter alia*, "any actual or purported act or transaction, whether or not evidenced by writing, and whether or not done or performed within the United States, the purpose, intent, or effect of which is to create, . . . convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property. Without limitation on the foregoing, it shall include the making, execution, or delivery of any assignment, power, conveyance, check, declaration, deed, deed of trust, power of attorney, power of appointment, bill of sale, mortgage, receipt, agreement, contract, certificate, gift, sale, affidavit, or statement; the making of any payment; the setting off of any obligation or credit; the appointment of any agent, trustee, or fiduciary; . . . [or] the exercise of any power of appointment, power of attorney." 31 C.F.R. § 579.311.

16. The Regulations further provide that the property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to § 579.201 of the Regulations are blocked, regardless of whether the entity itself is listed on the SDN List.

17. The Regulations define certain exempt transactions, including personal communications, importation and exportation of certain informational materials, travel-related transactions, and transactions for the conduct of official business. In addition, an individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. However, the failure to obtain a license prior to transacting with an SDN is a violation of IEEPA, 50 U.S.C. § 1705(a).

**C. The Bank Secrecy Act**

18. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, in furtherance of its mission to safeguard the U.S. financial system. Under the Bank Secrecy Act, financial institutions are required to assist U.S. government agencies in detecting and preventing money laundering, including reporting suspicious activity that might signal criminal activity. Additionally, an amendment to the Bank Secrecy Act incorporates provisions of the USA Patriot Act, which requires every bank to adopt a customer identification program, commonly referred to as "Know Your Customer," as part of its Bank Secrecy Act compliance program. *See* 12 C.F.R. § 21.11; 12 C.F.R. § 21.21.

19. FinCEN has issued guidance to U.S. financial institutions related to reporting of suspicious activity related to Russia and/or corruption, including:

(a) In April 2008, FinCEN issued "guidance to financial institutions "regarding financial transactions that may involve senior foreign political figures . . . seeking to move the proceeds of foreign corruption to or through the U.S. financial system." FinCEN, FIN-2008-G005, Guidance to Financial Institutions on Filing Suspicious Activity Reports Regarding the Proceeds of Foreign Corruption (April 17, 2008). The guidance instructed U.S. financial institutions that "consistent with the standard for

reporting suspicious activity as provided for in 31 C.F.R. part 103, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or other violation of law or regulation, the financial institution should then file a Suspicious Activity Report" ("SAR"). *Id.*

(b) In August 2017, FinCEN warned U.S. financial institutions about the use of shell companies in order to "obscure the illicit origin of . . . funds." *See* FinCEN, FIN-2017-A003, Advisory to Financial Institutions and Real Estate Firms and Professionals (Aug. 22, 2017). The advisory stated that "[s]hell companies can often be formed without disclosing the individuals that ultimately own or control them (*i.e.*, their beneficial owners) and can be used to conduct financial transactions without disclosing their true beneficial owners' involvement. Criminals abuse this anonymity to mask their identities, involvement in transactions, and origins of their wealth, hindering law enforcement efforts to identify individuals behind illicit activity." *Id.* In addition, FinCEN warned that "[c]riminals can use all-cash purchases to make payments in full for properties and evade scrutiny- on themselves and the origin of their wealth- that is regularly performed by financial institutions in transactions involving mortgages." *Id.*

(c) In June 2018, FinCEN warned U.S. financial institutions that "[f]oreign corrupt [politically exposed persons] PEPs, through their facilitators, may amass fortunes through the misappropriation of state assets and often exploit their own official positions to engage in . . . money laundering, embezzlement of state funds, and other corrupt activities." *See* FinCEN, FIN-2018-A003, Advisory on Human Rights Abuses Enabled by Corrupt Senior Foreign Political Figures and Their Financial Facilitators (June 12, 2018). "PEP facilitators commonly use shell companies to obfuscate ownership and mask the true source of the proceeds of corruption. Shell companies are typically non-publicly traded corporations or limited liability companies (LLCs) that have no physical presence beyond a mailing address and generate little to no independent economic value." *Id.*

(d) In March 2022, as well as in prior alerts, FinCEN provided U.S. financial institutions with several "Red Flag Indicators" of possible sanctions evasion activity, including, but not limited to: "[u]se of shell companies to conduct international wire transfers, often involving financial institutions in jurisdictions distinct from

> company registration"; "[u]se of third parties to shield the identity of sanctioned persons and/or PEPs seeking to hide the origin or ownership of funds, for example, to hide the purchase or sale of real estate"; "[a]ccounts in jurisdictions or with financial institutions that are experiencing a sudden rise in value being transferred to their respective areas or institutions, without a clear economic or business rationale"; and "[j]urisdictions previously associated with Russian financial flows that are identified as having a notable recent increase in new company formations." *See* FinCEN Alert, FIN-2022-Alert001, FinCEN Advises Increased Vigilance for Potential Russian Sanctions Evasion Attempts (March 7, 2022).

**D. <u>Bank Fraud</u>**

20. Pursuant to 18 U.S.C. § 1344, it is illegal to knowingly execute, or attempt to execute, a scheme or artifice to defraud a financial institution, or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

**E. <u>Money Laundering</u>**

21. Pursuant to 18 U.S.C. § 1956(a)(1)(A)(i), it is unlawful for anyone to conduct or attempt to conduct a financial transaction that involves the proceeds of specified unlawful activity ("SUA"), knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of SUA.

22. Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for anyone to conduct or attempt to conduct a financial transaction that involves the proceeds of SUA, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, and knowing that the transaction is designed, in whole or in part, to

conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of SUA.

23. Pursuant to 18 U.S.C. § 1956(a)(2)(A), it is unlawful for anyone to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of SUA.

24. Pursuant to 18 U.S.C. § 1956(a)(2)(B)(i), it is unlawful for anyone to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of SUA.

25. Pursuant to 18 U.S.C. § 1957, it is unlawful for anyone to knowingly engage or attempt to engage in a monetary transaction in criminally derived property that is in an amount greater than $10,000 and is derived from SUA.

26. Pursuant to 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in 18 U.S.C. §§ 1956 and 1957.

27. Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity" includes violations of 50 U.S.C. § 1701 *et seq.* (IEEPA).

28. Pursuant to 18 U.S.C. § 1961(1)(B), as incorporated by 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity" includes violations of 18 U.S.C. §§ 1344 (bank fraud), 1956 (money laundering) and 1957 (transactions in property derived from SUA).

**F. <u>Concealment of Source of Assets in Monetary Transactions</u>**

29. Pursuant to 31 U.S.C. § 5335(b), it is unlawful for any person to knowingly conceal, falsify, or misrepresent, or attempt to conceal, falsify, or misrepresent, from or to a financial institution, a material fact concerning the ownership or control of assets involved in a monetary transaction if the person or entity who owns or controls the assets is a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure, and the aggregate value of the assets involved in one or more monetary transactions is not less than $1,000,000.

**G. <u>Forfeiture Statutes</u>**

30. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or any property traceable to such property, is subject to forfeiture to the United States.

31. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344, or any offense constituting SUA (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit any such offenses, is subject to forfeiture to the United States.

32. Pursuant to 31 U.S.C. § 5335(e)(2), any property involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, and any property traceable thereto, is subject to forfeiture to the United States.

# FACTS

## A. Andrii Derkach and Oksana Terekhova

33. Andrii Derkach ("Derkach") is a 55-year-old Ukrainian national. After studying at Kharkiv Higher Military Command, Derkach served as a combat crew commander in the Soviet Union's Strategic Missile Forces. From 1990 to 1993, he attended and graduated from the Moscow-based Academy of the Ministry of Security of Russia, also known as the Academy of the Federal Security Service ("FSB") of the Russian Federation. Derkach thereafter assumed multiple roles in the Ukrainian government.

34. Since 1998, except for a one-year hiatus from November 2006 to November 2007, Derkach has been a member of the Verkhovna Rada ("Rada"), Ukraine's Parliament, and, as such, is considered a PEP. During his time in the Rada, Derkach has been a member of the Party of Regions, a pro-Russia political party which was the ruling party in Ukraine from 2010 until the 2014 Ukrainian Euromaidan Revolution. More recently, Derkach represented the Sumy region in northeastern Ukraine and claims to be an independent with no political party affiliation.

35. On or about September 10, 2020, OFAC added Derkach to its SDN List for his efforts to influence the 2020 U.S. presidential election. According to information publicly released by OFAC, Derkach was "an active Russian agent for over a decade, maintaining close connections with the Russian Intelligence Services," who "waged a covert influence campaign" to undermine the 2020 presidential election.

36. On or about January 11, 2021, OFAC added NabuLeaks and Era-Media TOV ("Era-Media") to the SDN List as entities owned and controlled by Derkach. According to

OFAC's press release, NabuLeaks and Era-Media were "media front companies in Ukraine that push false narratives at Derkach's behest. Derkach has been the de facto owner of Era-Media-related companies since the 1990s. More recently, Derkach created the NabuLeaks platform to disparage the National Anti-Corruption Bureau of Ukraine ("NABU")."

37. Oksana Terekhova ("Terekhova") is a 49-year-old Ukrainian national and the wife of Derkach. On Terekhova's 2017 U.S. visa application, she listed her employer as "Broadcasting Company Radio Era," understood to be a reference to Era-Media.

38. According to Ukrainian public databases and records, Derkach was the "founder" and "beneficiary" of Era-Media. On Derkach's own website, derkach.com.ua, Derkach was identified as "Honorary President of the media holding company Era-Media." In some public Ukrainian records, Terekhova was listed as a "beneficial owner" or "founder" of Era-Media. After OFAC added Era-Media to the SDN List, Terekhova was removed as a "beneficial owner" and "founder" from these records.

**B. <u>Purchase and Ownership of the Defendant Condominiums</u>**

39. In or about 2013, Derkach and Terekhova devised a scheme to purchase the Defendant Condominiums while concealing Derkach's interest in the transactions from U.S. financial institutions. The scheme utilized a U.S.-based financial services professional (the "Nominee") who assisted Derkach and Terekhova in setting up and managing several corporate entities designed to hide Derkach's ownership interest in the Defendant Condominiums and related financial holdings.

40. In or about and between 2013 and 2019, Derkach and Terekhova communicated with the Nominee through emails and during numerous in-person meetings in the

United States to discuss the purchase and maintenance of the Defendant Condominiums. Derkach and Terekhova viewed together a variety of properties before deciding to purchase the Defendant Condominiums.

41. At the direction of Derkach and Terekhova, the Nominee established two corporate entities in California, 73DT Business Properties, LLC ("73DT") and 7D Business Bureau, Inc. ("7D"). On corporate documents, 7D is the "Managing Member" of 73DT, and Terekhova is listed as the President, Director, Chief Executive Officer, Secretary, and Chief Financial Officer of 7D. In addition, the Nominee is listed as the Chief Executive Officer of 73DT. Derkach's name does not appear anywhere on the corporate documents for either 73DT or 7D. Notably, "DT" are the letters correlating to the last names of Derkach and Terekhova.

42. As part of the scheme, Derkach and Terekhova misrepresented details about Derkach's identity to the Nominee. As discussed *infra*, after one U.S. financial institution refused to open an account for Derkach and Terekhova upon doing its Know Your Customer research, Derkach told the Nominee that he was a "different Andrii Derkach." Derkach and Terekhova caused the Nominee to falsely represent ownership of funds and bank accounts to U.S. financial institutions, thereby deceiving those institutions holding the accounts and processing transactions related to, involving, and on behalf of Derkach and blocked property.

43. In or about July 2013, Derkach and Terekhova met with a wealth manager in Beverly Hills affiliated with a multinational investment bank and financial services company. They sought to open an account in the name of 7D, with Terekhova listed as the beneficial owner and the Nominee serving as account signatory. Derkach would not be named on the account. The initial deposit would be for $500,000, which Terekhova claimed was from the sale of stock

in Era-Media. Terekhova stated that the expected assets under management would be approximately $2.5 million, and she identified herself as a "supervisor" and 18% owner of Era-Media. While Terekhova claimed on the application to have worked for Era-Media since 2001, she stated in her 2007 U.S. visa application that she was employed by a Ukrainian nuclear energy company where Derkach was also employed at the time.

44. One of the application questions asked if "any of the beneficial owners, authorized signatories, grantors/settlors/creators, trustees or individuals acting as power of attorney" were "politically exposed persons." Terekhova indicated on the application that Derkach, her husband, was a politically exposed person who was currently serving in the Rada, but that Derkach would not be a beneficiary on the account.

45. After conducting its due diligence, including Know Your Customer research, the bank refused to open the account on January 2, 2014, citing extensive negative press about Derkach. When queried about this by the Nominee, Derkach stated that the bank must have confused him with another person named "Andrii Derkach."

46. Between July 26, 2013 and October 3, 2013, the Nominee received from Derkach and Terekhova approximately six wire transfers totaling $3.92 million in a client trust account, namely, the "Client Specific Trust Account," with account number ending in 9713, held at Pacific Western Bank (the "Nominee's Client Trust Account"), for the purpose of purchasing the Defendant Condominiums. These wire transfers originated from two overseas accounts in the names of shell companies, Sakret Ltd ("Sakret") and James Trade + Invest S.A. ("James Trade"). Sakret and James Trade were registered in the British Virgin Islands. Neither Sakret

nor James Trade has any public business profile, internet presence, or discernible affiliation with either Derkach or Terekhova.

47. The Sakret and James Trade bank accounts were held at banks in Latvia and Switzerland, respectively. Neither of the bank accounts were in the name of or had any visible affiliation with Derkach or Terekhova. The Nominee received these funds in the Nominee's Client Trust Account, which also had no identifiable connection to Derkach or Terekhova.

48. At the direction of Derkach and Terekhova, in or about August 2013, the Nominee transferred approximately $3.115 million of the $3.92 million from the Nominee's Client Trust Account to an account at a title insurance company for the purchase of the Defendant Condominiums.

49. On or about December 6, 2013, Unit 103 was purchased for approximately $1.65 million, and Unit 203 was purchased for approximately $1.55 million. Both purchases were paid in cash and executed in the name of 73DT by the Nominee, with neither Derkach nor Terekhova having any visible affiliation with the purchases or ownership of the Defendant Condominiums.

50. On or about December 20, 2013, Derkach and Terekhova sought to open a brokerage account at Morgan Stanley, namely, account number ending in 3427 held in the name of 7D (the "Morgan Stanley Account"). The Morgan Stanley Account opening documents were completed by the Nominee, not Terekhova. Notably, as part of opening the Morgan Stanley Account, the Nominee submitted a two-page document from the California Secretary of State listing Terekhova as the President, Director, Chief Executive Officer, Chief Financial Officer

and Secretary of 7D. However, the application for the Morgan Stanley Account omitted material information regarding Derkach and Terekhova, as the application did not acknowledge that Derkach or Terekhova, who had ownership interests in 7D and the Morgan Stanley Account, "[wa]s or ha[d] been a Politically Exposed Person, also known as a senior foreign political figure or an immediate family member or close associate of a senior foreign political figure." The application also misrepresented that 7D was not "beneficially or majority owned or controlled by the senior foreign political official." The account opening agreement from the Morgan Stanley Account also required that the account would "not be used for any transactions with, or for the benefit of, any person, entity or country that is the subject of any sanctions administered or enforced by [OFAC], including…any person . . . designated on [the SDN List]."

51. Following the purchases of the Defendant Condominiums, approximately $800,000 of the original $3.92 million sent by Derkach and Terekhova for those purchases remained in the Nominee's Client Trust Account. In or about December 2013, $400,000 from the Nominee's Client Trust Account was deposited into the Morgan Stanley Account. In or about March 2014, another $400,000 from the Nominee's Client Trust Account was deposited into the Morgan Stanley Account. The funds invested in the Morgan Stanley Account earned approximately $12,640.

52. In or about and between January 2014 and September 2015, approximately $98,000 in funds from the Morgan Stanley Account were used to pay expenses associated with the Defendant Condominiums, such as property taxes, homeowner association dues and utilities.

53. In or about and between September 2015 and January 2016, approximately $36,000 in funds from the Nominee's Client Trust Account were used to pay expenses associated with the Defendant Condominiums, such as homeowner association dues, utility bills and taxes.

**C. <u>The Defendant Accounts</u>**

54. In or about August 2015, the Nominee opened the Stifel Account. The Stifel Account records reflect that the account was registered by the Nominee as the "Secretary," "President" and "Sole Officer" of 7D. The Stifel Account application did not refer to either Derkach or Terekhova.

55. On or about and between September 16, 2015 and October 2, 2015, a total of approximately $710,538 was transferred from the Morgan Stanley Account to the Stifel Account. On or about February 18, 2016, $85,000 from the Nominee's Client Trust Account was also transferred to the Stifel Account.

56. In or about and between February 2017 and April 2022, periodic transfers totaling approximately $505,000 from the Stifel Account were made to a business checking account at Community Bank, namely, the Citizens Account.[1] The Nominee was listed in account documents as "Secretary" of 7D. Nowhere on the account application or opening documents for the Citizens Account are Derkach or Terekhova acknowledged as having any ownership interest or affiliation with the Citizens Account or with 7D.

57. Since in or about November 2016, the Citizens Account has been used to

[1] When this account was opened, the bank was known as Community Bank. Community Bank was acquired by Citizens Business Bank in or about 2018.

make payments on behalf of Derkach and Terekhova for the maintenance of the Defendant Condominiums. An average of approximately $95,000 per year has been paid toward homeowner association dues, utilities, taxes and other fees related to the Defendant Condominiums. In each instance, the Nominee initiated the payment from the Citizens Account on behalf of Derkach and Terekhova. To date, approximately $534,000 in expenses pertaining to the Defendant Condominiums have been paid from the Citizens Account.

58. In addition, funds from the Citizen Account and Stifel Account were used to pay the Nominee for the services he provided for and on behalf of Derkach and Terekhova with respect to the Defendant Condominiums and financial holdings.

59. At meetings between the Nominee, Derkach and Terekhova, Derkach reviewed financial statements involving the costs associated with the Defendant Condominiums. Derkach also reviewed statements from the Stifel Account and opined to the Nominee that the underlying portfolio in the Stifel Account should be more profitable.

60. Unaware of the details regarding Derkach's identity, the Nominee continued to make transactions from the Stifel Account and Citizens Account after September 10, 2020, when Derkach was sanctioned pursuant to E.O. 13848 and added to the SDN List. Pursuant to Section 2(a) of E.O. 13848, blocked property is property that "may not be transferred, paid, exported, withdrawn, or otherwise dealt in. However, because Derkach and Terekhova concealed Derkach's identity and involvement from the financial institutions holding the aforementioned bank and brokerage accounts, Derkach and Terekhova prevented those financial institutions from moving the funds in the Defendant Accounts into blocked accounts, and instead caused those financial institutions to engage in transactions involving blocked funds,

and transactions for the benefit of the Defendant Condominiums, which were also blocked property pursuant to E.O. 13848 and the corresponding Regulations.

61. Several of the transactions involving blocked funds were in amounts greater than $10,000, including a $50,000 transfer from the Stifel Account to the Citizens Account on October 13, 2020; a $100,000 transfer from the Stifel Account to the Citizens Account on July 30, 2021; and a $30,000 transfer from the Stifel Account to the Citizens Account on April 28, 2022. As of June 2022, the portfolio value of the Stifel Account was over $400,000.

62. Additionally, since September 10, 2020, over $200,000 in payments have been made from the Citizens Account for the benefit of the Defendant Condominiums, which are blocked property pursuant to E.O. 13848 and the corresponding Regulations. These payments include property taxes, homeowner association fees, utilities and other fees.

63. According to records relating to the Defendant Condominiums, after September 10, 2020, the list of authorized residents of the Defendant Condominiums included Derkach and Terekhova's children, and Derkach's mother and father, but omitted Derkach and Terekhova.

**D. <u>Derkach's Dominion and Control Over the Defendant Condominiums</u>**

64. As discussed above, Derkach and Terekhova approached the Nominee together to discuss purchasing the Defendant Condominiums and both were present for meetings. The Nominee understood that one of the Defendant Condominiums was for Derkach and Terekhova to reside in, and the other would be for their daughter.

65. The Nominee met with Derkach approximately four times – twice in 2013, once in 2015 and once in 2017 – regarding the Defendant Condominiums. Derkach appeared to have "veto power" over any decision and was there to monitor how the money was spent. For example, Derkach reviewed financial statements, including the costs associated with the Defendant Condominiums and the performance of the investments made with the remaining funds.

66. Derkach and Terekhova were both present when a real estate broker showed them multiple properties in 2013 before they settled on the Defendant Condominiums. The real estate broker understood that his clients were both Derkach and Terekhova, and that the Defendant Condominiums were to be investments for the Derkach family.

67. Derkach was seen inside one of the Defendant Condominiums on several occasions in or around 2018, when his daughter was living there.

68. Derkach and Terekhova's daughter also made statements to numerous third parties that "her father" owns the Defendant Condominiums, and that her living situation and finances were structured to avoid implicating her father or sanctions (*e.g.*, not using credit cards or owning/leasing cars in her own name).

69. On numerous occasions, Derkach and Terekhova's daughter told employees at the Defendant Condominiums' building that her father owns two units in the building, and, specifically, that he owns the Defendant Condominiums.

70. The Defendant Condominiums' building employees identified Derkach and Terekhova as being at the Defendant Condominiums repeatedly, including living in one of the units for substantial periods of time.

71. As discussed above, documents from the Defendant Condominiums' homeowners association reflect that, in December 2020, the listed residents/representatives of the Defendant Condominiums included Derkach's and Terekhova's children, and Derkach's parents.

72. Additionally, on the day sanctions were imposed on Derkach, September 10, 2020, Derkach and Terekhova's daughter moved out of the Defendant Condominiums.

**FIRST CLAIM FOR RELIEF**
**(Property Involved in Money Laundering)**

73. Plaintiff repeats the allegations set forth above as if fully set forth herein.

74. The Defendants *In Rem* were involved in or are traceable to property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

75. By reason of the foregoing, the Defendants *In Rem* are liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**
**(Proceeds Traceable to Bank Fraud and IEEPA Violations)**

76. Plaintiff repeats the allegations set forth above as if fully set forth herein.

77. The Defendants *In Rem* constitute or are derived from proceeds traceable to violations of 18 U.S.C. §§ 1344 and/or 50 U.S.C. § 1701 *et seq.*, or a conspiracy to commit such offenses.

78. By reason of the foregoing, the Defendants *In Rem* are liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**THIRD CLAIM FOR RELIEF**
**(Property Involved In a Concealed Source of Assets Monetary Transaction Violation)**

79. Plaintiff repeats the allegations set forth above as if fully set forth herein.

80. The Defendants *In Rem* were involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, or are property traceable thereto.

81. By reason of the foregoing, the Defendants *In Rem* are liable to condemnation and forfeiture to the United States pursuant to 31 U.S.C. § 5335(e)(2).

WHEREFORE, plaintiff the United States of America, requests that: warrants of this Court be issued for the arrest of the Defendant Accounts; due process issue to enforce the forfeiture of the Defendant Accounts and Defendant Condominiums; that due notice of these proceedings be given to all interested persons to appear and show cause why forfeiture should not decreed; that the Defendant Accounts and Defendant Condominiums be forfeited and condemned to the use of the United States; that the Plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court may deem just and proper.

Dated: Central Islip, New York
December 7, 2022

BREON PEACE
United States Attorney
*Attorney for Plaintiff*
Eastern District Of New York
610 Federal Plaza
Central Islip, New York 11722

BY: MADELINE O'CONNOR Digitally signed by MADELINE O'CONNOR Date: 2022.12.07 10:47:09 -05'00'

Madeline O'Connor
Assistant United States Attorney
(631) 715-7870

**VERIFICATION**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and, as such, have knowledge of the facts underlying this action.

2. I have read the within Verified Complaint In Rem and know the contents thereof.

3. The matters contained in the within Verified Complaint In Rem are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge and information provided by other law enforcement officers, FBI personnel, witnesses and financial institutions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 7, 2022

Kenneth Wolf
Special Agent
Federal Bureau of Investigation