UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA,

                    Plaintiff,

          -against-

REAL PROPERTY AND PREMISES KNOWN AS 432 NORTH
OAKHURST DRIVE, CONDOMINIUM UNIT 103, BEVERLY
HILLS, CALIFORNIA 90210, AND ALL PROCEEDS
TRACEABLE THERETO;

REAL PROPERTY AND PREMISES KNOWN AS 432 NORTH
OAKHURST DRIVE, CONDOMINIUM UNIT 203, BEVERLY
HILLS, CALIFORNIA 90210, AND ALL PROCEEDS
TRACEABLE THERETO;

ANY AND ALL FUNDS ON DEPOSIT IN STIFEL
NICOLAUS & CO. ACCOUNT NUMBER ENDING
IN 9142, HELD IN THE NAME OF 7D BUSINESS
BUREAU INC., AND ALL PROCEEDS TRACEABLE THERETO;
and

ANY AND ALL FUNDS ON DEPOSIT IN CITIZENS BUSINESS
BANK ACCOUNT NUMBER ENDING IN 7135, HELD IN THE
NAME OF 7D BUSINESS BUREAU INC., AND ALL PROCEEDS
TRACABLE THERETO,

                    Defendants *In Rem*.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

22-CV-7410
(DLI) (PK)

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
STRIKE THE CLAIMS FILED BY 7D BUSINESS BUREAU, INC. AND 73DT
BUSINESS PROPERTIES, LLC UNDER THE FUGITIVE DISENTITLEMENT
DOCTRINE**

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        United States Attorney
MADELINE O'CONNOR                       Eastern District of New York
Assistant U.S. Attorney
Date of Service: July 17, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................... 2

    **A.**  The Criminal and Civil Forfeiture Allegations ........................................... 2

    **B.**  Ownership of 7D and 73DT ............................................................................ 5

    **C.**  The Claims Filed by 7D and 73DT ............................................................... 6

    **D.**  Derkach and Terekhova's Knowledge of and Refusal to Face the Criminal Charges Against Them ................................................................. 7

ARGUMENT ............................................................................................................................... 9

    **I.**     THE FUGITIVE DISENTITLEMENT STATUTE ................................... 9

    **II.**    THE CLAIMS FILED BY 7D AND 73DT SHOULD BE STRICKEN UNDER THE DOCTRINE OF FUGITIVE DISENTITLEMENT ....................... 12

    **A.**  Warrants Were Issued in the Criminal Case for the Arrest of Derkach and Terekhova ................................................................................ 13

    **B.**  Derkach and Terekhova Had Notice and Knowledge of the Arrest Warrants ...... 13

    **C.**  The Criminal Case is Directly Related to the Civil Forfeiture Action ................... 14

    **D.**  Terekhova and Derkach Are Not Confined or Otherwise Held in Custody in Another Jurisdiction ................................................................. 15

    **E.**  Terekhova and Derkach Have Deliberately Avoided Prosecution By Purposefully Leaving the United States, Declining to Reenter the United States, and Otherwise Evading the Jurisdiction of the Court in the Criminal Case ................................................. 15

    **F.**  There is No Dispute That Terekhova Controls 7D and 73DT ................................ 16

CONCLUSION .......................................................................................................................... 17

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004)………………………………9, 10, 11, 13

*Rogers v. Palmer*, 102 U.S. 263 (1880)…………………………………………………………13

*United States v. 2005 Pilatus Aircraft Bearing Tail No. N679PE*,
2015 WL 12839118 (S.D. Tex. July 16, 2015)………………………………………………..17

*United States v. 2005 Pilatus Aircraft Bearing Tail No. N679PE*,
838 F.3d 662 (5th Cir. 2016)……………………………………………...…………………..16

*United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30 (D.D.C. 2007)......10, 11, 12, 17

*United States v. Contents of Account No. 68108021*, 228 F. Supp. 2d 436 (S.D.N.Y. 2002)...…11

*United States v. Real Property Located at 2323 Main Street, Irvine, Ca.*,
2020 WL 4373414 (C.D. Cal. March 11, 2020)………………………………………..10, 12

*United States v. Technodyne LLC*, 753 F.3d 368 (2d Cir. 2014)………………………...…….........11

### STATUTES

28 U.S.C. § 2466..…………………………………………………......................................1, 9, 10, 12

28 U.S.C. § 2466(a)..…………………………………………………….................................... 9, 10

28 U.S.C. § 2466(b)..…………………………………………………….................... 9, 10, 12, 17

**PRELIMINARY STATEMENT**

The UNITED STATES OF AMERICA (the "United States" or the "government"), by and through its counsel, Breon Peace, United States Attorney for the Eastern District of New York, Madeline O'Connor, Assistant United States Attorney, of counsel, respectfully submits this memorandum of law in support of its Motion to Strike the claims filed by 7D Business Bureau, Inc. ("7D") and 73DT Business Properties, LLC ("73DT") (collectively, "Claimants") under the fugitive disentitlement doctrine, codified at 28 U.S.C. § 2466.

As discussed more fully herein, the forfeiture allegations in the civil forfeiture complaint filed by the government in the instant action arose out of the same criminal conduct charged against defendants Andrii Derkach ("Derkach") and Oksana Terekhova ("Terekhova") in the criminal case, *United States v. Andrii Derkach and Oksana Terekhova*, 22-CR-432 (S-1) (DLI) (E.D.N.Y.) (the "Criminal Case"). Although Derkach and Terekhova are aware of the criminal charges against them in the Criminal Case, they have not returned to the United States to face those criminal charges or to challenge the forfeiture of the defendants *in rem* in the Criminal Case. Instead, Derkach and Terekhova seek to challenge the forfeiture of the defendants *in rem* in the instant civil case through their entities, 7D and 73DT, using a nominee to represent the entities, while they remain beyond the jurisdiction of the Court in the Criminal Case. However, the doctrine of fugitive disentitlement bars fugitives, such as Derkach and Terekhova, from exploiting the judicial process to their advantage in a civil case, while scoffing at the Court in a related criminal case. Accordingly, the claims filed by 7D and 73DT must be stricken.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Criminal and Civil Forfeiture Allegations

On December 7, 2022, the government filed the above-captioned civil forfeiture complaint.  Docket Entry ("DE") 1.  The civil forfeiture complaint seeks forfeiture of: (1) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 103"); (2) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 203"); (3) any and all funds on deposit in Stifel Nicolaus & Co. account number ending in 9142, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto (the "Stifel Account"); and (4) any and all funds on deposit in Citizens Business Bank account number ending in 7135, held in the name of 7D Business Bureau Inc., and all proceeds traceable thereto (the "Citizens Account") (collectively, the "Defendants *In Rem*"), as: property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property; property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344, and/or 50 U.S.C. § 1705(a) (International Emergency Economic Powers Act ("IEEPA")), or a conspiracy to commit such offenses; and/or as property involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, and property traceable thereto.  *See* DE 1.

On September 26, 2022, prior to the filing of the civil complaint, an Indictment was returned by a grand jury in the Eastern District of New York charging Derkach with:

2

(1) conspiracy to violate IEEPA, in violation of 50 U.S.C. §§ 1705(a) and (c); (2) bank fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and (4) engaging in monetary transactions in property derived from specified unlawful activity ("SUA"), in violation of 18 U.S.C. § 1957.  *See* Criminal Case, DE 3. Subsequently, on January 23, 2023, a Superseding Indictment was returned, which charged Derkach's wife,[1] Terekhova, with the same crimes as Derkach.  *See id.*, DE 9.  Notably, the forfeiture allegations in the civil forfeiture complaint arose out of the same criminal conduct charged against Derkach and Terekhova in the Superseding Indictment.

The Superseding Indictment and civil forfeiture complaint allege, in sum and substance, that since 1998, except for a one-year hiatus from November 2006 to November 2007, Derkach has been a member of the Verkhovna Rada ("Rada"), Ukraine's Parliament.  DE 1 at ¶ 34; Criminal Case, DE 9 at ¶ 2.  During his time in the Rada, Derkach has been a member of the Party of Regions, a pro-Russia political party which was the ruling party in Ukraine from 2010 until the 2014 Ukrainian Euromaidan Revolution.  DE 1 at ¶ 34; Criminal Case, DE 9 at ¶ 2.  On September 10, 2020, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") sanctioned Derkach, calling him "an active Russian agent for over a decade, maintaining close connections with the Russian Intelligence Services," who "waged a covert influence campaign" to undermine the 2020 presidential election.  DE 1 at ¶ 35; Criminal Case, DE 9 at ¶ 3.

The Superseding Indictment and civil forfeiture complaint further allege that, beginning in 2013, Derkach and Terekhova devised a scheme to purchase and maintain two

---

[1] Although Derkach and Terekhova appear to have divorced in or about February 2020, evidence obtained through the investigation revealed that Derkach and Terekhova's daughter stated, in sum and substance, that the divorce was a sham for the purposes of protecting the family's assets.  *See* Affidavit of Special Agent Kenneth Wolf ("Wolf Affidavit") at ¶ 8.

luxury condominiums in Beverly Hills -- defendants *in rem* Unit 103 and Unit 203 -- while concealing Derkach's interest in the transactions from U.S. financial institutions.  DE 1 at ¶ 39; Criminal Case, DE 9 at ¶ 14.  Specifically, Derkach and Terekhova used the services of a corporate nominee, namely, Yosef Manela ("Manela"); a multi-tiered structure of California-based shell companies, namely, 7D and 73DT; and numerous U.S. bank and brokerage accounts, including the defendants *in rem* Stifel Account and Citizens Account, to perpetrate their scheme. DE 1 at ¶ 39, 41, 49, 54-62; Criminal Case, DE 9 at ¶ 14, 18, 30-33.

Using the above-described framework, Derkach and Terekhova wired approximately $3.92 million to Manela from overseas accounts in Latvia and Switzerland belonging to companies registered in the British Virgin Islands.  DE 1 at ¶¶ 46-47; Criminal Case, DE 9 at ¶ 23.  A portion of that money was then used to pay $3.2 million for the purchases of Unit 103 and Unit 203 in the name of 73DT, with neither Derkach nor Terekhova having any visible affiliation with the purchases or ownership of Unit 103 and Unit 203.  DE 1 at ¶¶ 48-49; Criminal Case, DE 9 at ¶ 24.  Approximately $800,000 of the funds remaining after the purchases was invested in a Morgan Stanley brokerage account held in the name of 7D, which was maintained by Manela for Derkach and Terekhova's benefit and used to pay expenses on the condominiums, including taxes, homeowners' fees, and utilities.  DE 1 at ¶¶ 50-52, Criminal Case, DE 9 at ¶ 25.

Manela subsequently established the defendant *in rem* Stifel Account in the name of 7D and funded that account with money from the Morgan Stanley brokerage account and the client trust account held by Manela that had received the wire transferred funds.  *See* DE 1 at ¶¶ 54-55; Criminal Case, DE 9 at ¶ 26.  Manela also established the defendant *in rem* Citizens Account in the name of 7D and funded that account with money from the defendant *in rem* Stifel Account.  *See* DE 1 at ¶¶ 56, 61; Criminal Case, DE 9 at ¶¶ 27, 32.  The Citizens Account was

4

used to make payments on behalf of Derkach and Terekhova for the maintenance of the

defendants *in rem* Unit 103 and Unit 203.  *See* DE 1 at ¶ 57, 60, 62; Criminal Case, DE 9 at ¶¶

30-31, 33.  In addition, funds from the Citizens Account and Stifel Account were used to pay

Manela for the services he provided for and on behalf of Derkach and Terekhova with respect to

the Defendants *In Rem.  See* DE 1 at ¶ 58, 60; Criminal Case, DE 9 at ¶¶ 30-31.

Because Derkach and Terekhova had fraudulently obscured details about

Derkach's identity and involvement from the financial institutions holding the aforementioned

bank and brokerage accounts, they prevented those financial institutions from moving funds into

blocked accounts, and instead caused those financial institutions to engage in transactions

involving blocked funds and transactions for the benefit of the condominiums, which were

blocked property pursuant to the sanctions.  DE 1 at ¶ 60; Criminal Case, DE 9 at ¶ 31.

## B.   Ownership of 7D and 73DT

As discussed above, and as alleged in the Superseding Indictment and civil

forfeiture complaint, Terekhova and Derkach utilized a multi-tiered structure of California-based

shell companies --  namely, 7D and 73DT -- to purchase and maintain, and to conceal Derkach's

interest in the Defendants *In Rem*.  DE 1 at ¶ 39; Criminal Case, DE 9 at ¶ 14.  As Claimants

concede, the defendants *in rem* Stifel Account and Citizens Account were established in the

name of 7D, and the defendants *in rem* Unit 103 and Unit 203 were purchased in the name of

73DT.  *See* Declaration of Assistant U.S. Attorney Madeline O'Connor ("O'Connor

Declaration") at Exhibit A, 7D's Responses to Special Interrogatories Nos. 5, 10; O'Connor

Declaration, Exhibit B, 73DT's Responses to Special Interrogatories Nos. 5, 10.  Funds in the

Stifel Account, which originated from the overseas accounts in Latvia and Switzerland belonging

to shell companies registered in the British Virgin Islands, were transferred to the Citizens

Account and then used to pay expenses relating to Unit 103 and Unit 203.  *See, e.g.,* DE 1 at ¶¶

46-47, 51, 55-58, 62.  *See also* O'Connor Declaration, Exhibit A, 7D's Response to Special Interrogatory No. 6; O'Connor Declaration, Exhibit B, 73DT's Responses to Special Interrogatories Nos. 4, 6.

    7D is a California corporation that was incorporated by Manela on or about July 25, 2013, and lists Terekhova as its sole shareholder of record.  *See, e.g.*, Wolf Affidavit at ¶¶ 11, 12.  73DT is a California limited liability company that was organized by Manela on or about July 25, 2013, and lists 7D as its managing member of record.  *See* Wolf Affidavit at ¶¶ 13, 14.  Although Claimants dispute Derkach's interest in and control over 7D and 73DT, they do not deny that Terekhova -- who is also a fugitive -- controls 7D and 73DT, as Claimants consistently assert that Terekhova is the sole shareholder of 7D, which, in turn, is the sole member of 73DT.  *See* O'Connor Declaration, Exhibit A, 7D Responses to Special Interrogatories Nos. 1, 3, 10, 14; O'Connor Declaration, Exhibit B, 73DT's Responses to Special Interrogatories Nos. 1, 3, 10, 14.

  **C.**  **The Claims Filed by 7D and 73DT**

    On February 21, 2023, 7D filed a claim asserting an interest in the Stifel Account and the Citizens Account ("7D's Claim"), and 73DT filed a claim asserting an interest in Unit 103 and Unit 203 ("73DT's Claim") (collectively, the "Claims").  *See* DE 17; DE 18.  Although counsel for 7D and 73DT told the government on January 17, 2023 -- before it filed the Claims on behalf of 7D and 73DT -- that it represents 7D, 73DT, *and Terekhova* in the above-captioned civil forfeiture case, and despite the fact that Terekhova is the sole owner of record of 7D, which, in turn, is the sole member of record of 73DT, the Claims were verified by a third-party, Zaourbek Sagaev ("Sagaev"), an individual who had no prior affiliation with 7D and 73DT, rather than by Terekhova, a fugitive.  *See* Declaration of Assistant U.S. Attorney Madeline O'Connor ("O'Connor Declaration") at ¶ 7; DE 17 at p. 3 (Verification of 7D's Claim by Sagaev); DE 18 at p. 3 (Verification of 73DT's Claim by Sagaev).

Notably, on February 2, 2023 -- 19 days before the Claims were filed in this action -- Statements of Information for 7D and 73DT were filed with California's Secretary of State, which stated that Manela was the "Chief Executive Officer, Secretary, Chief Financial Officer" and "Director" of 7D, and "Manager or Member" of 73DT.  *See* O'Connor Declaration at ¶¶ 3, 5.  In fact, it was not until February 27, 2023 -- 6 days *after* Sagaev verified the February 21, 2023 Claims as the President of 7D and Manager of 73DT -- that Statements of Information were filed with California's Secretary of State recording that Sagaev was the new President of 7D and new Manager of 73DT.  *See* O'Connor Declaration at ¶¶ 4, 6; DE 17 at p. 3; DE 18 at p. 3.  Thus, the timing of the recordation of Sagaev as the new President of 7D and new Manager of 73DT raises questions as to whether Sagaev was, in fact, the President of 7D and Manager of 73DT when the Claims were verified, and further demonstrates that the last minute installation of Sagaev was done for the purpose of circumventing the disentitlement of 7D and 73DT's Claims by having a third-party nominee verify the Claims, rather than Terekhova, who could not do so because she is a fugitive.

### D.     Derkach and Terekhova's Knowledge of and Refusal to Face the Criminal Charges Against Them

As discussed above, on September 26, 2022, an Indictment was returned charging Derkach with: (1) conspiracy to violate IEEPA, in violation of 50 U.S.C. §§ 1705(a) and (c); (2) bank fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and (4) engaging in monetary transactions in property derived from specified unlawful activity ("SUA"), in violation of 18 U.S.C. § 1957.  *See* Criminal Case, DE 3.  The Indictment contained forfeiture allegations, which, *inter alia*, provided notice of the government's intent to seek forfeiture of the Defendants *In Rem*.  *Id.* at ¶¶ 43-48.  On December 7, 2022, the Indictment was unsealed.  *See* Criminal Case, DE 7.  The Criminal Case garnered significant world-wide media attention, including, but not limited to, news articles published by

Reuters, The Times of Israel, The New York Times, the Associated Press, CNN, Fox News, and the Toronto Star.  *See* Wolf Affidavit at ¶ 6.

On January 23, 2023, a Superseding Indictment was returned by a grand jury in the Eastern District of New York, charging Derkach and Terekhova with: (1) conspiracy to violate IEEPA, in violation of 50 U.S.C. §§ 1705(a) and (c); (2) bank fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and (4) engaging in monetary transactions in property derived from SUA, in violation of 18 U.S.C. § 1957.  *See* Criminal Case, DE 9.  The Superseding Indictment also contains forfeiture allegations, which, *inter alia*, provide notice of the government's intent to seek forfeiture of the Defendants *In Rem*.  *Id.* at ¶¶ 44-49.

On February 6, 2023, counsel for the government emailed Terekhova's counsel – who represent 7D, 73DT and Terekhova in the above-captioned civil case – to confirm their representation of Terekhova in the Criminal Case.  *See* Declaration of Assistant U.S. Attorney Artie McConnell ("McConnell Declaration) at ¶ 5; O'Connor Declaration at ¶ 7.  That same day, Terekhova's counsel sent a reply email confirming their representation of Terekhova in the Criminal Case.  McConnell Declaration at ¶ 5.  The next day, February 7, 2023, government counsel sent an email to Terekhova's counsel inquiring as to whether they were aware of the Superseding Indictment and arrest warrant for Terekhova.  *Id.* at ¶ 6.  Government counsel pointedly asked whether Terekhova and Derkach would be returning to the United States and appearing in the Criminal Case.  *Id.*  Terekhova's counsel responded that they were not aware of the Superseding Indictment and arrest warrant and asked government counsel to send them copies of same.  *Id.*  Terekhova's counsel further stated that they would review the Superseding Indictment and arrest warrant and respond to the government.  *Id.*  Government counsel

immediately responded to Terekhova's counsel's email and provided Terekhova's counsel with copies of the Superseding Indictment and arrest warrant for Terekhova.  *Id.*

Despite Terekhova's counsel's statement that they would respond to government counsel after reviewing the Superseding Indictment and arrest warrant, they did not do so. McConnell Declaration at ¶ 7.  Thus, on March 14, 2023, government counsel sent a follow-up email to Terekhova's counsel asking whether they had any updates for the government.  *Id.* Terekhova's counsel did not respond to the follow-up email.  *Id.*  Terekhova's counsel's failure to respond to the government and complete silence after receiving copies of the Superseding Indictment and arrest warrant for Terekhova demonstrate that neither Derkach nor Terekhova intend to return to the United States to face the criminal charges against them.

## ARGUMENT

### I.   THE FUGITIVE DISENTITLEMENT STATUTE

Congress has "specifically conferred statutory authority on federal courts to order disentitlement in civil forfeiture cases."  *Collazos v. United States*, 368 F.3d 190, 198 (2d Cir. 2004) (citations omitted).  The district court has discretion in deciding "whether to order disentitlement in a particular case."  *Id.*  Title 28, United States Code, Section 2466, entitled "Fugitive disentitlement," provides, in relevant part, that the Court "(a) . . . may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action" if the Court finds that the person "purposely leaves the jurisdiction of the United States," "declines to enter or reenter the United States to submit to its jurisdiction" or "otherwise evades the jurisdiction of the court in which a criminal case is pending against the person."

Section 2466(b) further provides that the Court may disallow "a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the

corporation is a person to whom subsection (a) applies."  Section 2466(b) essentially applies "a

veil piercing or alter ego inquiry," to "impute[]" fugitive disentitlement to a corporation that is

controlled by the fugitive.  *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30, 43

(D.D.C. 2007).  Thus, Section 2466(b) "allows a court to act in cases," such as this one, "where

the relationship between a corporate entity-claimant and a fugitive natural person is such that the

person can be said to be acting through the corporate entity in an attempt at 'using the resources

of the courts of the United States in furtherance of a claim' in a forfeiture case."  *Id.*  Indeed,

"Subsection (b) is critical to carrying out the aims of the Fugitive Disentitlement Statute—

without it, individuals who are fugitives from criminal actions could still make claims in civil

forfeiture actions under corporate guises."  *United States v. Real Property Located at 2323 Main

Street, Irvine, Ca.*, 2020 WL 4373414, at *6 (C.D. Cal. March 11, 2020), vacated on other

grounds, 2020 WL 4373412 (C.D. Cal. May 12, 2020); *see also $6,976,934.65 Plus Interest*, 478

F. Supp. 2d at 43 ("We must prevent fugitives from hiding behind a corporate veil or front from

challenging those forfeitures.  If they can't do it in their own right while they're on the run, they

shouldn't be able to do it behind a corporate front.") (quoting Remarks of Mary Lee Warren,

Dep. Asst. Attorney General, Criminal Division, Before Hearing of House Financial Services

Committee, "Dismantling the Infrastructure of Global Terrorism," (Oct. 3, 2001) (internal

quotation marks omitted)).

   "By its terms, [28 U.S.C. § 2466] identifies five prerequisites to disentitlement."

*Collazos*, 368 F.3d at 198.  First, "a warrant or similar process must have been issued in a

criminal case for the claimant's apprehension."  *Id.*  Second, "the claimant must have had notice

or knowledge of the warrant."  *Id.*  With regard to this second requirement, courts do not require

that "the fugitive be served with actual notice or that [she] have complete knowledge of all

charges against [her]."  *$6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 39.  Rather, courts

inquire as to whether there was "sufficient information" that would have "put the claimant on notice that [she was] called to answer criminal charges in the United States." *Id.*

Third, "the criminal case must be related to the forfeiture action." *Collazos*, 368 F.3d at 198.  In making this determination, courts consider "the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors." *$6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 40 (quoting *United States v. Contents of Account No. 68108021*, 228 F. Supp. 2d 436, 440 (S.D.N.Y. 2002), *aff'd*, *Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004)) (internal quotation marks omitted).

 Fourth, "the claimant must not be confined or otherwise held in custody in another jurisdiction." *Collazos*, 368 F.3d at 198.  "Courts find this prong to be established when there is no suggestion that the individual at issue is in custody somewhere." *$6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 40-41.

Lastly, "the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant." *Collazos*, 368 F.3d at 198.  Courts do not read this requirement "in an overly technical manner, but have aimed to sweep up people 'who know that they are subject to arrest in this country' yet have not subjected themselves to criminal process." *$6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 41 (quoting *Collazos*, 368 F.3d at 197).  "Even if a departure was motivated by reasons that did not include the avoidance of criminal prosecution, a claimant may be barred from contesting forfeiture if he or she declines to reenter the United States in order to avoid prosecution." *United States v. Technodyne LLC*, 753 F.3d 368, 383 (2d Cir. 2014).  The Court may find that the fugitive had the intent to decline to reenter the United

States to avoid criminal prosecution even if the fugitive had other motivations for declining to re-enter.  *Id.* at 385-86 ("As Congress sought to bar the unseemly spectacle of allowing an accused to absent himself deliberately in order to avoid prosecution in the United States while using United States courts to retrieve the proceeds of his crime,  it would defy logic to infer that Congress *sub silentio* intended to allow the fugitive to create such an abomination by the simple expedient of claiming some additional reason for not returning.") (citation and internal quotation marks omitted).

## II.    THE CLAIMS FILED BY 7D AND 73DT SHOULD BE STRICKEN UNDER THE DOCTRINE OF FUGITIVE DISENTITLEMENT

The claims filed by 7D and 73DT should be stricken under the doctrine of fugitive disentitlement because Terekhova and Derkach are both fugitives who are attempting to use the shell companies they control to challenge the forfeiture in the civil proceeding while they avoid facing the criminal charges against them in the related criminal proceedings.  These are the exact circumstances that the fugitive disentitlement statute is intended to address.  As the court in *Real Property Located at 2323 Main St.* observed:

> Lawmakers amended Section 2466 to add subsection (b) due to "concern over fugitives using corporations they control to submit claims they themselves could not submit."  *$6,976,934.65 Plus Interest*, 478 F. Supp. 2d at 43; *see also id.* ("We must prevent fugitives from hiding behind a corporate veil or front from challenging these forfeitures.") (quoting Remarks of Mary Lee Warren, Dep. Asst. Attorney General, Criminal Division, Before Hearing of House Financial Services Committee, "Dismantling the Infrastructure of Global Terrorism," (Oct. 3, 2001)). . . . In addition, the House Report on the amendment states that subsection (b) " 'clarifies' that a fugitive may not avoid disentitlement 'by filing, or having another person file, a claim on behalf of a corporation that the fugitive controls.' " *Id.*

2020 WL 4373414, at *6 n.4.

As discussed below, the five prerequisites to fugitive disentitlement are easily satisfied in this case.

A.      **Warrants Were Issued in the Criminal Case for the Arrest of Derkach and Terekhova**

The first prerequisite to disentitlement  -- that "a warrant or similar process must have been issued in a criminal case for the claimant's apprehension"  -- has been met here. *Collazos*, 368 F.3d at 198.  Arrest warrants were issued for both Derkach and Terekhova.  *See* McConnell Declaration at ¶¶  2, 4.

B.      **Derkach and Terekhova Had Notice and Knowledge of the Arrest Warrants**

It is difficult to fathom that Derkach did not have notice and knowledge of the Criminal Case and the arrest warrant for him given that the first Indictment generated significant media coverage world-wide when it was unsealed.  *See* Wolf Affidavit at ¶ 6.  Nevertheless, there can be no dispute that Terekhova had notice and knowledge of the Criminal Case and the arrest warrant that was issued for her.  To begin with, Terekhova's attorneys were made aware of and received copies of her arrest warrant and the Superseding Indictment.  *See* McConnell Declaration at ¶ 6.   On February 6, 2023, in an email correspondence with the government, Terekhova's counsel confirmed their representation of Terekhova in the Criminal Case.  *Id.* at ¶ 5.  During email correspondence with the government on February 7, 2023, the government provided Terekhova's counsel with notice of the Superseding Indictment and warrant for Terekhova's arrest and inquired whether Terekhova and Derkach would be returning to the United States to surrender.  *Id.*  at ¶ 6.  The government also provided Terekhova's counsel with copies of the Superseding Indictment and Terekhova's arrest warrant.  *Id.*  Thus, Terekhova had notice and knowledge of the Superseding Indictment and the warrant for her arrest.  *See, e.g.*, *Rogers v. Palmer*, 102 U.S. 263, 267–68 (1880) (explaining that the law presumes that an attorney communicates notice of any matter within the scope of representation to the client).

Moreover, evidence shows that Derkach, Terekhova and their family had prepared for and were expecting the sanctions and related criminal and civil litigation against Derkach and

his interests.  For example, on the same day Derkach was sanctioned in 2020, Derkach and

Terekhova's younger daughter moved out of the defendant *in rem* condominium in which she

had been living.  *See* Wolf Affidavit at ¶ 15.  Further, when Derkach and Terekhova's younger

daughter had been informed by a friend of hers about the government's forfeiture action against

Unit 103 and Unit 203, she stated that she had been expecting the government's actions.  *Id.* at ¶

17.  Indeed, Terekhova and Derkach's use of 7D and 73DT to purchase and maintain, and

attempt to conceal Derkach's interest in, the Defendants *In Rem*, is itself proof that Derkach and

his family were preparing for the sanctions and aware of the potential for related criminal and

civil litigation against Derkach and his interests.

Moreover, Terekhova's actions with regard to the instant civil forfeiture case

demonstrate that Terekhova was aware of the criminal charges against her.  At some point after

the Superseding Indictment was returned, Manela ceased working for Derkach and Terekhova,

and their entities, 7D and 73DT.  *See* Wolf Aff. at ¶ 18.  Indeed, while Manela filed a claim to

the Defendants *In Rem* on his own behalf, which claim he subsequently withdrew, he did not file

the Claims on behalf of 7D and 73DT.  *See* DE 19 & DE 26.  Notably, the fact that Terekhova

and Derkach used the nominee, Sagaev, who was previously unaffiliated with 7D and 73DT, to

file the Claims on behalf of the entities, rather than have Terekhova – the sole owner of record of

the entities, and the only person other than Manela who had visible affiliation with 7D and 73DT

– file the Claims, supports the conclusion that Terekhova was aware of the criminal charges

against her, as well as the fact that she, as a fugitive, could not directly challenge the forfeiture in

the related civil forfeiture action.  *See* DE 17 at p. 3; DE 18 at p. 3.

**C.**     **The Criminal Case is Directly Related to the Civil Forfeiture Action**

Much like the first two prerequisites, there can be no dispute that the instant

forfeiture action is related to the Criminal Case.  The civil forfeiture complaint tracks much of

the language in the Superseding Indictment.  *Compare* DE 1 with Criminal Case, DE 9.  The

Superseding Indictment also contains forfeiture allegations, which, *inter alia*, provide notice of

the government's intent to seek forfeiture of the Defendants *In Rem*.  Criminal Case, DE 9 at ¶¶

44-49.

        **D.**     **Terekhova and Derkach Are Not Confined or Otherwise Held in Custody in Another Jurisdiction**

        The fourth pre-requisite to disentitlement – that the claimant must not be confined

or otherwise held in custody in another jurisdiction – is also met here.  There is no evidence that

Derkach or Terekhova are confined or in custody in another jurisdiction.  *See* Wolf Affidavit at ¶

19.

        **E.**     **Terekhova and Derkach Have Deliberately Avoided Prosecution By Purposefully Leaving the United States, Declining to Reenter the United States, and Otherwise Evading the Jurisdiction of the Court in the Criminal Case**

        Derkach, Terekhova and their family's actions have demonstrated their intent to

flee the United States and not return, and, as such, the fifth pre-requisite is also satisfied.  For

example, between 2013 and 2020, Derkach and Terekhova came to the United States on

numerous occasions to, *inter alia*, meet with Manela and a wealth manager, explore real estate,

and, after purchasing the defendants *in rem* Unit 103 and Unit 203, reside in one of them.  *See*

Wolf Affidavit at ¶ 20.  Derkach and Terekhova's younger daughter resided in one of the

defendant *in rem* condominiums between around 2018 and 2020.  *Id.*  Documents from the

homeowners association for the defendant *in rem* condominiums also reflect that, in December

2020, the listed residents/representatives of Unit 103 and Unit 203 included Derkach's and

Terekhova's children, and Derkach's parents.  *Id.*  However, on the same day Derkach was

sanctioned in 2020, Derkach posted a message on Facebook criticizing the sanctions against him,

and his and Terekhova's younger daughter moved out of the defendant *in rem* condominium in

which she had been living.  *Id. at* ¶ 15*.*  Neither Derkach, Terekhova, nor their eldest daughter

has returned to the United States since early 2020.  *Id.* at ¶ 21.  Similarly, Derkach and

Terekhova's younger daughter fled the United States in August 2021 and has not returned.  *Id.*

Accordingly, the evidence demonstrates that while Derkach, Terekhova and their family

regularly traveled to and resided in the United States prior to the sanctions and the Criminal

Case, they fled the United States in 2020 and 2021 and have not returned.  *See United States v.*

*2005 Pilatus Aircraft Bearing Tail No. N679PE*, 838 F.3d 662 (5th Cir. 2016) (affirming district

court's finding that the defendant claimant's travel history demonstrated that the defendant

claimant was deliberately avoiding criminal prosecution).

        Terekhova's counsel's failure to respond to the government's inquiry about

whether Derkach and Terekhova will return to the United States to face the charges, and

complete silence after receiving copies of the Superseding Indictment and Terekhova's arrest

warrant also demonstrate that neither Derkach nor Terekhova intends to return to the United

States to face the criminal charges against them.  In sum, the evidence plainly demonstrates that

Terekhova and Derkach have fled the United States and have no intent to return to face the

charges against them.

      **F.**    **There is No Dispute That Terekhova Controls 7D and 73DT**

        The government alleges in the Superseding Indictment and civil forfeiture

complaint, and the evidence shows, that Derkach and Terekhova established 7D and 73DT to

conceal Derkach's interest in the Defendants *In Rem*.  *See* DE 1 at ¶¶ 39, 41; Criminal Case, DE

9 at ¶¶ 14, 18; Wolf Aff. at ¶ 9.  Although Claimants dispute Derkach's interest in and control

over 7D, 73DT and the Defendants *In Rem*, they do not deny that Terekhova -- who is also a

fugitive -- controls 7D and 73DT, and has an interest in the Defendants *In Rem*.  In fact,

Claimants, in no uncertain terms, assert that Terekhova is the sole shareholder of 7D, and that 7D

is the sole member of 73DT.  *See* O'Connor Declaration, Exhibit A, 7D Responses to Special

Interrogatories Nos. 1, 3, 10, 14; O'Connor Declaration, Exhibit B, 73DT's Responses to Special

Interrogatories Nos. 1, 3, 10, 14.  Further, 7D has stated that Terekhova, not 7D or 73DT, is the

person who holds "an[] interest in . . . the defendant accounts [and] the defendant

condominiums."  O'Connor Declaration, Exhibit A, 7D Response to Special Interrogatory No.

12.  Accordingly, Section 2466(b) should bar the claims filed by 7D and 73DT as there is no

dispute that these entities are controlled by Terekhova, who is a fugitive, and because the

evidence demonstrates that Terekhova is using 7D and 73DT to assert claims to the Defendants

*In Rem* that she, as a fugitive, cannot assert herself.  *See United States v. 2005 Pilatus Aircraft*

*Bearing Tail No. N679PE*, 2015 WL 12839118, at *1 n.2 , *2 n. 3, *6 (S.D. Tex. July 16, 2015)

(dismissing under Section 2466(b) claims filed by companies for which the fugitive defendant

claimant served as director and principal shareholder and as registered agent), *report and*

*recommendation adopted*, 2016 WL 7230209 (S.D. Tex. Jan. 25, 2016), *aff'd*, 838 F.3d 662 (5th

Cir. 2016); *$6,976,394.64 Plus Interest*, 478 F. Supp. 2d at 43 (recognizing that "disentitlement

should be extended" to a company where the fugitive could "be deemed to be acting through it to

advance the forfeiture claim").

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court

17

strike the Claims filed by 7D and 73DT.

Dated: Central Islip, New York
      July 17, 2023

                                          BREON PEACE
                                          United States Attorney
                                          Eastern District of New York
                                          *Attorney for Plaintiff*
                                          610 Federal Plaza
                                        Central Islip, New York 11722

                    By:      */s/ Madeline O'Connor*
                                  Madeline O'Connor
                                  Assistant U.S. Attorney
                                  (631) 715-7870