**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,                                              :

                                         Plaintiff,

                   -against-

REAL PROPERTY AND PREMISES KNOWN AS
432 NORTH OAKHURST DRIVE,
CONDOMINIUM UNIT 103, BEVERLY HILLS,
CALIFORNIA 90210, AND ALL PROCEEDS
TRACEABLE THERETO;

REAL PROPERTY AND PREMISES KNOWN AS
432 NORTH OAKHURST DRIVE,
CONDOMINIUM UNIT 203, BEVERLY HILLS,                              Civil Action No. 22-CV-7410
CALIFORNIA 90210, AND ALL PROCEEDS
TRACEABLE THERETO;

ANY AND ALL FUNDS ON DEPOSIT IN STIFEL
NICOLAUS & CO. ACCOUNT NUMBER ENDING
IN 9142, HELD IN THE NAME OF 7D BUSINESS
BUREAU INC., AND ALL PROCEEDS
TRACEABLE THERETO; and

ANY AND ALL FUNDS ON DEPOSIT IN
CITIZENS BUSINESS BANK ACCOUNT
NUMBER ENDING IN 7135, HELD IN THE
NAME OF 7D BUSINESS BUREAU INC., AND
ALL PROCEEDS TRACABLE THERETO,

                                         Defendants *In Rem*

– – – – – – – – – – – – – – – – – – – – – – – – – – –X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>GOVERNMENT'S MOTION TO STRIKE</u>

                              STEPTOE & JOHNSON LLP
                              1114 Avenue of the Americas
                              New York, NY 10036
                              212 506 3900
                              *Attorneys for Claimants*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS ..................................................................................... 3

III.   APPLICABLE STANDARD................................................................................. 7

   A.   The Fugitive Disentitlement Statute ................................................................ 7

IV.  ARGUMENT ......................................................................................................... 9

   A.   Summary of Argument .................................................................................... 9

   B.   The Government Has Failed to Meet Its Burden of Proof on Three Elements of the Fugitive Disentitlement Statute .......................................................................... 10

      1.   The Government Has Failed to Show that Terekhova Has Knowledge of the Warrant 10

      2.   The Government Has Not Proven that Terekhova Is Not Confined or Held in Custody in Any Other Jurisdiction................................................................................... 16

      3.   The Government Has Not Proven that Terekhova Deliberately Left the U.S. or Refused to Return in Order to Avoid Prosecution........................................................... 17

   C.   The Court Should Exercise Its Discretion under the Statute to Decline to Strike the Claims........................................................................................................... 23

V.    CONCLUSION.................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Collazos v. U.S.*,
  368 F.3d 190 (2d Cir. 2004)....................................................................................2, 9, 14

*Degen v. United States*,
  517 U.S. 820 (1996)......................................................................................................8

*Rogers v. Palme*r,
  102 U.S. 263 (1880) ...................................................................................................13

*United States v. $1,152,366.18 in Funds from Bendura Bank AG*,
  No. 3:21-cv-01134, 2022 WL 2373356 (S.D. Cal. June 30, 2022) .............................22

*United States v. $191,910 in U.S. Currency*,
  16 F.3d 1051 (9th Cir. 1994) ........................................................................................8

*United States v. 38,000*,
  816 F.2d 1538, 1547 (11th Cir. 1987) ..........................................................................8

*United States v. $525,695.24 Seized from JPMorgan Chase Bank Investment Acct.
  #xxxxxxxx*, 869 F.3d 412 (6th Cir. 2017) ..................................................................19

*United States v. $6,976,934.65 Plus Interest*,
  478 F. Supp. 2d 30 (D.D.C. 2007), *rev'd*, 554 F.3d 123 (D.C. Cir. 2009) .............................16

*United States v. $6,976,934.65, Plus Interest Deposited into RBS*,
  554 F.3d 123 (D.C. Cir. 2009) ........................................................................ *passim*

*United States v. $671,160 in U.S. Currency*,
  730 F.3d 1051 (9th Cir. 2013) ....................................................................................18

*United States v. 2005 Pilatus Aircraft*,
  No. 2:12-cv-00223, 2016 WL 7230209 (S.D. Tex. Jan. 25, 2016), *aff'd* 838
  F.3d 662 (5th Cir. 2016) ..............................................................................................22

*United States v. All Right, Title and Interest...Trump World Towers*,
  No. 03-cv-07967, 2004 WL 1933559 (S.D.N.Y. Aug. 31, 2004)......................................14, 15

*United States v. Any and all Funds on Deposit, etc.*,
  87 F. Supp. 3d 163(D.D.C. 2015) ...............................................................................22

*United States v. Bajakajian*,
  524 U.S. 321 (1998)....................................................................................................20

*United States v. Batato*,
  833 F.3d 413 (4th Cir. 2016) ......................................................................................19

*United States v. Borromeo*,
    945 F.2d 750 (4th Cir. 1991) ........................................................................8, 9

*United States v. Krishnan's Real and Personal Property*,
469 F. Supp. 3d 481 (E.D.N.C. 2020) .................................................................14, 23, 24

*United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck*,
    357 F. Supp. 2d 1321 (S.D. Ala. 2005) ...........................................................23

*United States v. Real Property Known as 3678 Waynesville Road*,
    No. 3:05-cv-00029, 2007 WL 1982780 (S.D. Ohio July 6, 2007) ...........................14

*United States v. Real Property Known as 7208 East 65th Pl.*,
    185 F. Supp.3d 1288 (N.D. Okla. 2016) ...........................................................22

*United States v. Salti*,
    579 F.3d 656 (6th Cir. 2009) ..........................................................................18

*United States v. Technodyne LLC*,
    753 F.3d 368 (2d Cir. 2014)........................................................... *passim*

**Statutes**

18 U.S.C. § 983(c)(1)(3) ........................................................................8

28 U.S.C. § 2466 ...................................................................... *passim*

Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981, *et seq.* ............................8

**Other Authorities**

Supp. R. for Certain Admiralty or Mar. Claims and
    Asset Forfeiture Actions G(4)(b)(iii)(B)...............................................................13

Stefan D. Cassella, *Asset Forfeiture Law in the United States* (Juris, 3d Ed.) .......................8, 17

## I.     INTRODUCTION

The extraordinary remedy of disentitlement is neither legally justified nor appropriate under the circumstances in this case.  Neither 7D Business Bureau, Inc. ("7D") nor 73DT Business Properties, LLC ("73DT") (collectively, "Claimants") is a fugitive, and there is no evidence that either has been charged with any crime in the United States or elsewhere.  The government relies on a statutory provision intended by Congress to prevent indicted defendants from hiding behind sham or fraudulent corporate shields to protect proceeds of crime, and the government has not adequately alleged or proven that those circumstances are presented here.  Further, the government bears the burden of proof on each of the five essential elements of 28 U.S.C. § 2466, and the failure to prove even one mandates denial of relief.  Here, the government has failed to prove three of those elements.  Finally, even if they could prove all of them, which they cannot, this Court should exercise its discretion to decline to apply the relief, and allow the case to proceed on the merits and give Claimants their day in court.

The government's civil forfeiture theory rests on its allegations that the defendant two condominiums owned by 73DT and the seized contents of two bank accounts held by 7D were involved in violations of U.S. sanctions that were imposed against Andrii Derkach ("Derkach") in 2020, seven years after the funds used to acquire and maintain the defendant condominiums were deposited into a U.S. financial institution.  The government's real target in their motion is Oksana Terekhova ("Terekhova"), a foreign national who is the sole shareholder of Claimant 7D, which in turn is the sole member of 73DT, a limited liability company.  The government admits, openly and through its failure to submit any proof to the contrary, that there is no objective or admissible evidence suggesting that Derkach has (or ever had) any interest in the Claimants or any of the defendant assets, relying instead on unsupported and misogynist allegations that Terekhova, Derkach's ex-wife, whose divorce from Derkach was finalized eight months before the U.S.

1

sanctions were imposed against him, is merely a proxy for her now ex-husband.  Terekhova has not been sanctioned and is not alleged to have been involved in the activity for which Derkach was designated.  While Derkach was indicted shortly before the filing of the instant case, Terekhova was not indicted until months later, clearly to provide a basis for this motion.

However, the government has failed to prove that (1) Terekhova has notice or knowledge of the fact of her indictment and issuance of a warrant for her arrest in the United States; (2) she is not in custody in a foreign jurisdiction; or (3) she left or is refusing to reenter the United States in order to avoid criminal prosecution.  Each of these failures serves as a mandatory basis for denial of the motion.  Importantly, the application here of the fugitive disentitlement statute will not serve its legislative goal of preventing the "'unseemly spectacle . . . of a criminal defendant who . . . attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction.'"  *U.S. v. Technodyne LLC*, 753 F.3d 368, 377 (2d Cir. 2014) (quoting *Collazos v. U.S.*, 368 F.3d 190, 200 (2d Cir. 2004)).  Rather, its application will merely allow the government to avoid adversarial determinations whether it can articulate—and prove— claims that depend on unsupported suspicions and innuendo.

The evidence demonstrates that there was nothing unusual about either the creation of the corporate Claimants or their respective purposes.  The public filings are completely transparent and unambiguous.  The government's arguments to the contrary are founded upon factually unsupported conclusions, blind leaps of logic, multi-level and unattributed hearsay, and plainly erroneous assumptions.  The government's central argument seems to be that it is inconceivable that a woman could acquire property and own a company without doing so as a proxy for her (now

2

ex-)husband.  Where the facts diverge from the government's preferred narrative, it simply asks the Court to draw whatever conclusions serve the government's interests.

Disentitlement is no small thing.  While many forfeiture statutes describe what a court *must* do under certain circumstances, 28 U.S.C. § 2466 is not among them.  Even if this Court were to conclude that the government had proven the elements of § 2466, it can and should exercise its discretion to decline the government's request to dismiss the claims.  The law favors determinations of disputes on their merits, especially in civil forfeiture cases, and it would be a miscarriage of justice to deny Claimants the opportunity to defend this action, in which the government seeks to disentitle two corporate claimants who are not criminal defendants from defending against the forfeiture of millions of dollars in assets that are not alleged to have been derived from or traceable to any violation of U.S. law, merely because the majority shareholder of one of the Claimants used to be married to a sanctioned individual.  For all these reasons, the government's motion ("Motion") should be denied.

## II.    STATEMENT OF FACTS

The Motion lays out a series of allegations, many of which are faulty conclusions based on erroneous assumptions or inadmissible representations.  The gaps in the government's allegations and evidence are as important as the allegations themselves.

The government alleges that in 2013, Derkach and Terekhova began speaking with a California attorney named Yosef Manela ("Manela") about acquiring the defendant condominiums, and that Manela eventually established 7D and 73DT for that purpose.  Docket Entry ("Dkt.") 1 at ¶¶ 40-41; Motion at 7.[1]  On July 25, 2013, Manela filed Articles of Incorporation for Claimant 7D with the California Secretary of State, designating himself as

---

[1] The page numbers referenced herein with respect to filed documents use the PACER pagination.

3

registered agent and incorporator, Dkt. 29-8, and Articles of Organization of a Limited Liability Company for 73DT, designating himself as the registered agent and organizer.  Dkt. 29-10.  The 73DT Articles of Organization stated that the LLC would be managed by one manager.  *Id.*  The sole member of 73DT was 7D, Dkt. 30-1 at 4, and, according to the government, corporate documents identified 7D as the managing member of 73DT and Terekhova as the President, Director, Chief Executive Officer, Secretary and Chief Financial Officer of 7D.  Dkt. 1 at ¶ 41.  Manela was listed as the Chief Executive Officer of 73DT.  *Id.*

The business purpose of both Claimants was real estate investment.  Dkt. 30-1 (Resp. to Interrogs.) at 19.  Terekhova at all times was and is the sole shareholder of 7D.  *Id.* at 4.  The government admits that "Derkach's name does not appear anywhere on the corporate documents for either 73DT or 7D."  Dkt. 1 at ¶ 41.  As of December 6, 2013, Manela was the sole Director and Officer of 7D, with the power to bind the company, transfer funds for the purpose of acquiring real property, and manage the company and any properties acquired for 7D or 73DT, typical authority granted to the manager of a corporate entity created for the purpose of real estate investment.  Dkt. No. 29-9, at 1.[2]

The government alleges that Derkach and Terekhova wired approximately $3.92 million into Manela's trust account to pay for the condominiums sometime in 2013, but provide no proof of Derkach's involvement.  Dkt. 1 at ¶ 46.  Indeed, the escrow agreement for the purchase of the condominiums was signed by Terekhova in her capacity as the "Shareholder Group" and Shareholder, and by Manela as 73DT's Director.  Dkt. 29-9 at 5.  There is no allegation that

---

[2] Manela remained the sole officer and director of 7D, and the manager of 73DT, until his resignation from those positions on or about December 19, 2022, following the filing of the instant action.  Dkt. 30-1 at 4; Declaration of Ryan P. Poscablo ("Poscablo Decl."), Exhibit A (letter from Ed Robbins).

Derkach's name appears anywhere in the documents memorializing 73DT's purchase of the condominiums, which was completed on December 6, 2013, because it does not.  Dkt. 1 at ¶ 49. Following the acquisition of the properties, the remainder of the wired funds was deposited into an account at Morgan Stanley in the name of 7D.  *See id.* ¶ 51.  The government alleges that the 7D Morgan Stanley account was opened on or about December 20, 2013 by Manela who, as noted above, had been appointed the sole Officer and Director of 7D at least two weeks earlier, by December 6, 2013.  *See* Dkt. 29-9 at 1.  The government admits that, as part of the account opening process, Manela provided to Morgan Stanley "a two-page document from the California Secretary of State listing Terekhova as the President, Director, Chief Executive Officer, Chief Financial Officer and Secretary of 7D."  Dkt. 1 at ¶ 50.[3]  While the government alleges the application omitted material information, namely that Derkach had an ownership interest in 7D, and that the company was therefore owned or controlled by a "senior foreign political official" (or "politically exposed person"), *id.*, it fails to allege any facts suggesting that Derkach *actually* had any interest or involvement in 7D.[4]  As noted above, the government explicitly alleges elsewhere in the Complaint and in its Motion that Derkach had no apparent interest in the Claimants or the

---

[3] The referenced document is not attached to either the government's complaint or the Motion, but it appears that this document was intended to demonstrate Terekhova's prior status as officer and director of the company.

[4] Despite the claim that Derkach and Terekhova "fraudulently obscured details about Derkach's identity and involvement" with Claimants and the defendant assets, Dkt. 28-1 at 8, it admits that Terekhova advised at least one representative of a financial institution of her then-husband's status as a foreign politician while in Derkach's presence.  The two allegedly met on an undefined date with an unnamed "wealth manager in Beverly Hills affiliated with a multinational investment bank and financial services company" for the purpose of opening an account for 7D.  Dkt. 1 at ¶ 43. Terekhova, who completed the application to open the account, advised the banker that she would be opening the account in her capacity as the beneficial owner of 7D, that the account would be funded with proceeds of her sale of stock in a company by which she was employed and of which she was part-owner, and specifically advised that Derkach "was a politically exposed person who was currently serving in the Rada, but . . . would not be a beneficiary on the account."  *Id.* ¶ 44.

defendant assets.  Dkt. 1 at ¶¶ 41, 44 47, 49; Dkt. 28-1 at 7.  The government also alleges that Manela misrepresented to one or more financial institution that "7D was not 'beneficially or majority owned or controlled by [a] senior political official.'"  Dkt. 1 at ¶ 50 (internal quotation marks in original).  Again, however, neither the Complaint nor the Motion includes any allegations or evidence suggesting that Derkach was a beneficial or majority owner of 7D or that he controlled the company, just bare allegations to that effect.

The funds wired into the Morgan Stanley account were used to pay expenses for the defendant condominiums, including property taxes, homeowner association dues, and utilities. Dkt. 1 at ¶ 52.  In August 2015, Manela, in his capacity as sole Officer, President and Secretary of 7D, opened an account at Stifel Nicolaus & Co. ("Stifel") in the name of 7D, and funded the account with money transferred from the Morgan Stanley account.  *Id.* at ¶¶ 54-55.  Thereafter, Manela opened an account at Citizens Business Bank in the name of 7D (the "Citizens Account"), which was also funded by transfers from the Stifel account.  *Id.* at ¶ 56.  Beginning in November 2016, the Citizens Account is alleged to have been used to pay for the maintenance of the defendant condominiums, including during the time period following Derkach's designation.  *Id.* at ¶¶ 57, 61-62.  Those post-designation financial transactions are the foundation of the government's forfeiture claims.

Terekhova and Derkach were divorced in approximately February 2020.  Dkt. 20-7 (Divorce Court Decision) at 2.[5]

---

[5] The government alleges without attribution that Terekhova's daughter "stated [to some unidentified person], in sum and substance, that the divorce was a sham for purposes of protecting the family's assets."  Dkt. 28-1 at 6 n.1.  This allegation is hearsay within hearsay.  It is inadmissible and should be disregarded.

Derkach was designated as an SDN by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") approximately seven months after his divorce from Terekhova, on September 10, 2020, on the ground that he had acted to undermine the 2020 U.S. presidential election.  Dkt. 28-1 at 6.  Derkach was thereafter the sole defendant charged in a sealed indictment filed on September 26, 2022 (the "Derkach Indictment").  *Id.* at 5.  The Derkach Indictment was unsealed on or about December 7, 2022, the same day the instant action was filed.  *Id.* at 5, 10.  On January 23, 2023, the government filed a Superseding Indictment, adding Terekhova as a defendant with respect to all of the charges alleged in the original Derkach Indictment.  *Id.* at 6.

On February 18, 2023, Zaourbek Sagaev was appointed Director, President, Secretary and Chief Financial Officer of 7D, and Manager of 73DT.  On February 27, 2023, 7D filed with the California Secretary of State a Statement of Information in which Sagaev was designated Director, Chief Executive Officer, President, Secretary, and Chief Financial Officer of 7D.  Dkt. 30-4.  Also on February 27, 2023, 73DT filed with the California Secretary of State a Statement of Information in which Sagaev was designated Manager of 73DT.

## III.   APPLICABLE STANDARD

### A.   The Fugitive Disentitlement Statute

Federal civil asset forfeiture is governed by a comprehensive set of federal statutes and rules that define what is subject to forfeiture to the United States and under what circumstances. Unless specifically exempted, civil forfeiture actions are governed by the Federal Rules of Civil Procedure, including the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"), and the Federal Rules of Evidence (the "FRE"). The government bears the burden of proof on each element of the alleged underlying offense and the forfeiture theory advanced, 18 U.S.C. § 983(c)(1), and where, as here, the government's theory of forfeiture is that the defendant property was used to commit or facilitate an offense, the

government bears the additional burden of showing that there is a "substantial connection" between the property and the offense, *id.* § 983(c)(3), that is, a connection that is more than incidental or fortuitous.[6]  It is axiomatic that where the government bears the burden of proof on any point, it is required to satisfy that burden through the production of admissible evidence. *Cassella*, at § 11-2(d), 551.

Where the statutory forfeiture framework allows for the exercise of discretion, it invariably resides with the court, not the government, for the simple reason that civil forfeiture is an immensely powerful tool that has long been recognized by Congress and the courts as susceptible to overreach and potential abuse.[7]  As a result, "strict compliance with the letter of the law by those seeking forfeiture must be required."  *U.S. v. Borromeo*, 945 F.2d 750, 753 (4th Cir. 1991) (citing *U.S. v. $38,000*, 816 F.2d 1538, 1547 (11th Cir. 1987), for the traditional rule that the law disfavors forfeitures).

The fugitive disentitlement statute was enacted by Congress as part of CAFRA in response to the Supreme Court's holding in *Degen v. United States*, 517 U.S. 820 (1996), in which the Court ruled that the judicially-created disentitlement doctrine was not a rule that could be imposed without the approval of Congress.  *See id.* at 828.  When Congress codified the doctrine in § 2466, it imposed significant limits on its application, listing five essential elements: (1) issuance of a

---

[6] Stefan D. Cassella, *Asset Forfeiture Law in the United States*, § 11-2(c), 548 (Juris, 3d Ed.) ("*Cassella*").

[7] The enactment of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981, *et seq*. ("CAFRA"), which eliminated the 200-year old tradition of forcing civil forfeiture claimants to prove that property targeted by the government was *not* subject to forfeiture, was motivated largely by judicial criticism of the civil forfeiture process.  *See, e.g.*, *United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1068-69 (9th Cir. 1994) (overruled by CAFRA) ("We are particularly wary of civil forfeiture statutes, for they impose 'quasi-criminal' penalties without affording property owners all of the procedural protections afforded criminal defendants," and "may tempt the government to seek criminal law enforcement objectives through these nominally 'civil' proceedings.").

warrant or similar process for the claimant's apprehension; (2) claimant's knowledge of the warrant; (3) a relationship between the criminal and civil cases; (4) that claimant not be confined overseas; and (5) that claimant deliberately act to avoid criminal prosecution by leaving or declining to reenter the United States or otherwise evading the jurisdiction of the court where the criminal case is pending.  *Collazos*, 368 F.3d at 198.[8]  As an additional safeguard, however, the court has discretion to decide whether the sanction should be imposed on a particular claimant, even where the essential elements have been satisfied.  The evidentiary standard, as applied by the courts determining motions under the statute, is preponderance of the evidence, consistent with the civil nature of the cases.

## IV.    ARGUMENT

### A.    Summary of Argument

The Motion should be denied because the government has failed to meet its burden of proof on three of the essential elements of § 2466—that Terekhova has notice or knowledge of a warrant for arrest in the United States; that she is not detained in a foreign jurisdiction; and that she has failed or refused to reenter the United States for the purpose of avoiding criminal prosecution.  Failure to prove even one of the elements mandates denial.  Second, even if the Court concludes that the government has proven all five of the elements, this Court should exercise its discretion to decline to apply the statute because disallowing Claimants to defend against the government's forfeiture efforts will not serve the intended purpose of the statute.

---

[8] As a practical matter, the government will always be able to satisfy the first and third elements because it chooses who to criminally charge and what allegations it will rely upon in both the indictment and civil forfeiture complaint, but all five elements require an evidentiary showing. *Technodyne*, 753 F.3d at 379-80 (Government has the burden of proving each of the elements of § 2466).

**B.     The Government Has Failed to Meet Its Burden of Proof on Three Elements of the Fugitive Disentitlement Statute**

**1.     The Government Has Failed to Show that Terekhova Has Knowledge of the Warrant**

The government has not proven that Terekhova has notice or knowledge of the indictment or warrant.  In *Technodyne*, the Second Circuit confirmed that a forfeiture claimant's notice or knowledge of an outstanding arrest warrant was among the "affirmative facts[] as to which the government presumptively has access to proof," and that "[t]here can be no serious suggestion that a claimant should have the burden of proving the negative of such [a matter]." 753 F.3d at 380.

The government argues first that Derkach, who is neither a claimant nor a majority shareholder or owner of either Claimant, must have known about *his* having been indicted because the unsealing of the Derkach Indictment in early December 2022 "garnered significant media coverage world-wide."  Dkt. 28-1 at 10.  In support, Special Agent Wolf states in an affidavit that news articles about Derkach's indictment were published by Reuters, the Times of Israel, The New York Times, the Associated Press, CNN, Fox News, and the Toronto Star.  Wolf Affidavit, Dkt. 29 at ¶ 6.  However, Derkach's knowledge of the indictment against *him* is not at issue here.  The government's Motion is directed against the Claimants on the ground that *Terekhova* is a fugitive and that her fugitive status should be imposed on the Claimants pursuant to § 2466(b) because she is a majority shareholder of 7D, which is the sole member of 73DT. While the Complaint and moving papers include numerous conclusory allegations that Derkach holds an ownership interest in one or both of the Claimants and the defendant assets, the

government admits in both that Derkach has no "apparent" ownership or involvement in any of them.[9]

To the extent that the government's reliance on the media coverage of the Derkach Indictment is intended to suggest that *Terekhova* was aware of the Derkach Indictment in December of 2022, such notice or knowledge has no bearing on whether she was aware of the arrest warrant issued against her months later.  The Wolf Affidavit includes no allegation that the charges against Terekhova received world-wide media attention.  Even if it did, the mere existence of media coverage of the issuance of an indictment or arrest warrant is insufficient to satisfy the notice or knowledge element unless accompanied by evidence that the media coverage reached the alleged fugitive defendant wherever he or she was.  *See United States v. $6,976,934.65, Plus Interest Deposited into RBS*, 554 F.3d 123, 130 (D.C. Cir. 2009).  In *$6,976,934.65*, the government argued, and the district court found, that the element was satisfied by a showing that a newspaper in the nation where the alleged fugitive was purported to reside had published an article about the recent unsealing of the indictment against him.  *Id.* at 129-30.  The D.C. Circuit rejected that finding, reasoning that the evidence failed to show that the news had reached the alleged fugitive, and was therefore insufficient to satisfy the government's burden on that element.  *Id.* at 130.  The showing here is even less compelling, as there is no showing that there was any media coverage of Terekhova's indictment or where she was residing at the time (or is currently residing, for that matter).  The suggestion that she may

---

[9] *See, e.g.*, Dkt. 1 at ¶ 48 (Derkach had no affiliation with the acquisition of the condominiums by 73DT and was not identified to Morgan Stanley as either involved with 7D or 73DT or having an interest in the Morgan Stanley account); *id.* at ¶¶ 54, 56 (Derkach not acknowledged as having any interest in either the Stifel Account or Citizen Account).

have been aware of random world news reports concerning the indictment of her ex-husband is both unsupported and irrelevant.

The government next argues that the notice or knowledge requirement is satisfied here because "Terekhova's attorneys were made aware of and received copies of her arrest warrant and the Superseding Indictment." Dkt. 28-1 at 16. "[O]n February 6, 2023, in an email correspondence with the government, one of Terekhova's counsel confirmed their representation of Terekhova in the Criminal Case." *Id.* AUSA McConnell states in an affidavit that the alleged confirmation of representation occurred in an email exchange between himself and Ryan Poscablo, one of Claimants' attorneys. AUSA McConnell initiated the exchange as follows: "I am the AUSA handling the Derkach criminal matter. I understand you are representing Oksana Terekhova on some related civil matters. Are you representing her on the criminal case as well? Please let me know at your convenience. Thanks." *See* Poscablo Decl., Exhibit B at 2. Mr. Poscablo responded: "I'm your huckleberry. Let me know how I can be of service." *Id.* Nothing in Mr. Poscablo's response confirmed that he represented Terekhova in the criminal case, a conclusion bolstered by the fact that the next day, when AUSA McConnell asked whether Mr. Poscablo was aware that Terekhova had been named as a defendant in the Superseding Indictment and that an arrest warrant had been issued against her, Mr. Poscablo explained that he was not aware of either. *Id.*

Further, AUSA McConnell's email of February 6 referenced only the "Derkach criminal matter" and his belief that Mr. Poscablo was representing Terekhova in "some related civil matters." The inquiry into whether Mr. Poscablo's representation extended to the "criminal case" did not advise that Terekhova had been indicted or was subject to arrest or that there was a criminal case against her. Nor was there any reason Mr. Poscablo should have assumed that

AUSA McConnell's inquiry meant that Terekhova had been indicted.  Mr. Poscablo's use of 19th-century slang in his response was, at best, merely an acknowledgement that Mr. Poscablo was representing Terekhova in her capacity as the owner of the corporate entities in connection with the civil forfeiture case, a fact that had been confirmed several weeks earlier in an email to AUSA O'Connor from Mr. Poscablo's co-counsel Mr. Welk.  Poscablo Decl., Exhibit C.

The government is also mistaken in drawing the conclusion that sending copies of the indictment and the arrest warrant to a lawyer representing the companies owned by Terekhova in a separate civil matter was enough to satisfy the notice or knowledge requirement of § 2466.  Its reliance on *Rogers v. Palmer*, a Supreme Court case decided in 1880, for that proposition is badly misplaced, as it is neither factually nor legally analogous to the facts here.  *Rogers* was a bankruptcy fraud case in which the attorneys for one of the alleged fraudsters was actively and affirmatively involved in the underlying misconduct, and "knew and intended that their action on behalf of their client would work a fraud upon the bankrupt law."  102 U.S. 263, 267-68 (1880).  Nor does the statutory forfeiture framework support the proposition that notice of a parallel criminal prosecution to an attorney of a civil forfeiture claimant is sufficient to satisfy the notice or knowledge element, even though the opposite is true.  Rule G(4) of the Supplemental Rules, governing civil forfeiture procedure, provides that the government may accomplish notice of a civil forfeiture proceeding on a potential claimant by sending the notice to "the attorney representing the potential claimant with respect to the seizure of the property or in a related . . . criminal case."  Supplemental Rule G(4)(b)(iii)(B).  However, there is no corresponding provision that permits notice of criminal proceedings or an arrest warrant to be accomplished

13

through notice to the attorney for a potential civil forfeiture claimant.[10]  Even assuming there

were, by the time of the email exchanges described above, Terekhova was no longer a potential

civil forfeiture claimant.  In addition to the fact that none of the defendant assets is titled in her

name, the time to file claims had already expired.[11]

Courts that have addressed the question of whether the knowledge of an attorney for an

alleged fugitive that his client has been indicted or named in an arrest warrant satisfies the notice

or knowledge element have required evidence that the attorney's representation of the alleged

fugitive was directly related to the criminal case.  Thus, in *Collazos*, the element was satisfied

where the defendant's attorney conditioned the defendant's return to the U.S. on a grant of

pretrial release.  368 F.3d at 201; *see also United States v. Krishnan's Real and Personal

Property*, 469 F. Supp. 3d 481, 488-89 (E.D.N.C. 2020) (fugitive's awareness of an arrest

warrant satisfied by showing that an attorney representing him in the criminal case was aware of

the warrant); *United States v. All Right, Title and Interest...Trump World Towers*, No. 03-cv-

---

[10] This is so because the notice requirements in civil and criminal matters are substantively different given the nature of the two types of proceedings.  Civil forfeiture proceedings are *in rem*, and notice to potential claimants (who are not defendants in the action, but intervenors) is permitted to be accomplished through the mail, while criminal actions are *in personam*, requiring personal service of criminal process unless waived or explicitly permitted by some other method.

[11] None of the authorities relied upon by the government in the Motion suggest a different result. In *United States v. Real Property Known as 3678 Waynesville Road*, No. 3:05-cv-00029, 2007 WL 1982780, *4 (S.D. Ohio July 6, 2007), the government initiated a civil forfeiture action against several pieces of real property, and then subsequently indicted the owner of the property (Cost), a few months later, but was unable to locate him to execute the arrest warrant.  The government moved to disentitle Cost from defending against the forfeiture, arguing that Cost's absence was compelling evidence of his knowledge of the arrest warrant or, alternatively, that the knowledge of the arrest warrant on the part of Cost's attorney in the civil forfeiture case satisfied the notice or knowledge requirement.  The court disagreed, finding that the lawyer's knowledge of the arrest warrant was insufficient to show that Cost himself was aware, and denied the disentitlement motion without even addressing the other elements, noting that having failed to satisfy the notice element, "whether the government ha[d] introduced sufficient evidence to support the third and fifth elements [was] irrelevant."  *Id.* at *3 n.3.  This Court should reach the same result, especially since Terekhova, unlike Cost in *Waynesville Road*, is not a claimant in this action.

07967, 2004 WL 1933559, *2 (S.D.N.Y. Aug. 31, 2004) (letter sent to defense counsel for defendant in criminal case who fled after erroneously having been released from custody sufficient to put claimant on notice that he was a fugitive for purposes of § 2466).

The government's remaining arguments on this element are grounded in wild speculation and clearly inadmissible hearsay, and do not advance their argument. It argues, for example, that "Derkach, Terekhova and their family had prepared for and were expecting the sanctions and related criminal and civil litigation against Derkach and his interests." Dkt. 28-1 at 16-17. The alleged evidence supporting this contention is that Derkach and Terekhova's uncharged daughter is purported to have moved out of one of the condominiums on the day Derkach was sanctioned in September 2020, two years before the Derkach indictment. *Id.* at 17. Even if true, the mere fact of the move in 2020 is not evidence that Terekhova had the preternatural foresight to know that Derkach would be indicted two years later, much less that Terekhova would be indicted several months after that. Nor does anticipation of a future indictment translate into notice or knowledge in the event it occurs. The government further contends that the same daughter was later informed about the forfeiture case from a "friend of hers" at some unknown time and told either the unidentified "friend" or some other unidentified individual that "she had been expecting the government's actions." *Id.* In addition to being inadmissible double hearsay, this allegation cannot possibly be evidence that Terekhova knew she was the subject of an arrest warrant because she was not indicted until almost two months after the filing of this case.

Equally incredible is the government's argument that the notice element is satisfied by the replacement of Manela, the lawyer who helped set up the Claimants and acted as their representative since shortly after their creation in 2013, with someone other than Terekhova "who was previously unaffiliated with 7D and 73DT." *Id.* Setting aside the ridiculous

proposition that "prior affiliation" of a corporate officer, director or manager has any possible relevance, the government presents no evidence suggesting that it has any basis for alleging a lack of prior affiliation.  Similarly irrelevant is the fact that Manela, who filed and then withdrew a claim of his own that was directly adverse to that of 7D and 73DT, did not sign the claims for the two corporate entities.[12]  Because the government has failed to establish the notice or knowledge element of § 2466, the Motion must be denied.

### 2.    The Government Has Not Proven that Terekhova Is Not Confined or Held in Custody in Any Other Jurisdiction

The government devotes four lines of argument to the third element of § 2466, the material portion of which is a quote from the district court opinion in *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30, 40-41 (D.D.C. 2007), *rev'd*, 554 F.3d 123 (D.C. Cir. 2009): "Courts find this prong to be established when there is no suggestion that the individual at issue is in custody somewhere."  Dkt. 28-1 at 14.  However, the District of Columbia district court failed to identify a single other court that had so held, and no other court has relied upon this holding in the seventeen years since the case was decided.  The district court proceeded to hold that "[s]ince the record in this case gives no indication to the contrary, the Court finds that Scott is not in custody or otherwise confined in another jurisdiction."  478 F. Supp. 2d at 41.  The appellate court did not address the confinement element because the entity claimant in the case had admitted on appeal that the alleged fugitive was not confined in another jurisdiction.[13]  But in reversing and remanding the case, the appellate court rejected the district

---

[12] The government accurately alleges that Manela, on February 2, 2023, filed with the California Secretary of State Statements of Information for both 7D and 73DT indicating that he was still an officer and director of 7D and the manager of 73DT.  Dkt. 30-3; Dkt. 30-5.  However, neither filing was authorized by either of the Claimants, as Manela had resigned all of his positions with the Claimants months before.  Claimants were unaware of the February 2, 2023 filings until their receipt of the government's moving papers.

[13] Whether this concession was made in the district court is unknown.

court's erroneous conclusion that media coverage in the country where the alleged fugitive "apparently reside[d]" was enough to establish the notice and knowledge element.  *See $6,976,934.65*, 554 F.3d at 130.  The lower court's reasoning on the confinement issue was very similar to its erroneous holding on notice in the sense that the court treated the absence of any evidence of confinement as affirmative evidence of the lack of confinement.  That district court appears to stand alone on this point.

  As discussed above, the plain language of the statute and the judicial interpretation of that language require the government to prove each of the five elements, and the courts that have considered the statute are in unanimous agreement that the burden of proof resides with the government.  Claimants are unaware of any court (except the district court relied upon by the government) that has exempted the confinement element from this mandate.  The government has offered no evidence that Terekhova is not in custody within or outside of the United States.  Indeed, the government has offered no evidence that it has any idea where in the world Terekhova is located.  It has failed to carry its burden on this second essential element and its motion must be denied.

   **3. The Government Has Not Proven that Terekhova Deliberately Left the U.S. or Refused to Return in Order to Avoid Prosecution**

  In order to satisfy this element, the government must prove that Terekhova, having notice or knowledge of the arrest warrant issued against her "*in order to avoid criminal prosecution, purposely [left] the jurisdiction of the United States [or] decline[d] to enter or reenter the United States to submit to its jurisdiction.*"  28 U.S.C. § 2466(a)(1)(A)-(B) (emphasis added).  This

requires proof of a specific motive—the avoidance of prosecution—for Terekhova's refusal to enter or reenter the country after becoming aware of process against her.[14]

As the Second Circuit explained in *Technodyne*, "the government [is] required to prove that the [claimant] remained outside of the United States with the *specific intent* to avoid criminal prosecution," even if the claimant has other reasons not to enter or reenter.  753 F.3d at 383 (citation omitted) (emphasis added).  That holding brought the Second Circuit into alignment with the Ninth Circuit[15] and the D.C. Circuit, which held in *$6,976,934.65* that "mere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute.  The alleged fugitive must have 'declined to enter or reenter' the country in order to avoid prosecution."  554 F.3d at 132 (citations omitted).

While the consensus amongst the Circuits that have addressed the issue is that avoidance of prosecution need not be the sole, primary or dominant reason for the alleged fugitive's refusal to enter or reenter the United States, the rule includes the corresponding requirement that the claimant must have some reason to enter or reenter, other than for the prosecution.  In other words, the government must show, but fails to here, when their sole evidence is that the *only* reason the claimant has to enter or reenter the United States is the pending charges.  *See, e.g.*, *United States v. Salti*, 579 F.3d 656, 665-66 (6th Cir. 2009) (refusal to enter United States must be to avoid prosecution; declining to enter for health reasons would be a valid defense).  Put

---

[14] "In short, the government must show not only that the [alleged fugitive] has left the United States or that he is refusing to reenter it, *but also that his reason for doing so was (or is) to avoid prosecution*.  Conceivably, if the claimant had a valid reason for leaving or declining to enter or return to the United States that was unrelated to his fugitive status, Section 2466 would not apply." *Cassella*, § 9-4(3), 481 (emphasis in original).

[15] *See United States v. $671,160 in U.S. Currency*, 730 F.3d 1051, 1056 (9th Cir. 2013) (claimant must be shown to have made a conscious choice to remain outside the U.S., but extensive pattern of pre-indictment travel to the U.S. was sufficient to satisfy the element).

another way, the government does not allege that Terekhova had any reason to enter the United States. It does not allege, for example, that she resides here, or that she had plans to return here but chose not to do so.

The D.C. Circuit explained the distinction in *$6,976,934.65*, where the government had produced a video recording of a foreign national claimant in a television appearance in which he acknowledged that he would likely be arrested if he returned to the U.S. *$6,976,934.65*, 554 F.3d at 129. The government argued that the statement was evidence that the alleged fugitive was refusing to reenter the country for the purpose of evading prosecution. *Id.* at 131-32. However, the court found that the video also suggested that the claimant had no desire to reenter the U.S. "regardless of any pending charges." *Id.* at 132; *see also United States v. Batato*, 833 F.3d 413, 431 (4th Cir. 2016) (explaining that in *$6,976,934.65*, the claimant's statement on television "was insufficient to show *conclusively* that avoiding prosecution was even *a* reason that the claimant remained outside the United States, and neither the district court nor the government had actually attempted to show intent," having erroneously treated satisfaction of the "notice or knowledge" element as sufficient to satisfy the "declination to enter or reenter" element) (emphasis in original); *United States v. $525,695.24 Seized from JPMorgan Chase Bank Investment Acct. #xxxxxxxx*, 869 F.3d 412, 421 (6th Cir. 2017) (showing that foreign national claimant was able to leave the jurisdiction she was in was insufficient). The relevant inquiry is not whether the claimant (or, as here, the alleged fugitive shareholder of a claimant entity) is legally and physically capable of traveling to the United States, but whether she has any present or historical interest in doing so.

The importance of this concept cannot be overstated. While Congress enacted § 2466 to "bar the 'unseemly spectacle' of allowing an accused to absent himself deliberately in order to

avoid prosecution in the United States while using United States courts to retrieve the proceeds of his crime," *Technodyne*, 753 F.3d at 385-86, it is equally (if not more) unseemly for the government to initiate sequential criminal proceedings against a foreign national and parallel civil forfeiture proceedings against that foreign national's assets in the United States to force someone who has no reason to come to the United States to assume the risk of summary loss of his or her property.  This is especially true where, as here, (1) the government has failed to prove that Terekhova has notice or knowledge of the charges against her; (2) neither of the Claimants the government seeks to disentitle is a fugitive; (3) the government does not allege that the defendant assets were acquired with proceeds of violations of U.S. law; and (4) the amount alleged to have been involved in the financial-based crimes in which the defendant assets are alleged to have been involved represent only a tiny percentage of the value of the defendant assets, raising the issue that the forfeiture, if successful, would represent a constitutionally excessive fine under the Eighth Amendment.  *See United States v. Bajakajian*, 524 U.S. 321, 323 (1998).

The government obviously has access to records of Derkach's and Terekhova's travel to the United States, but has failed to present any evidence of the frequency or duration of their visits since 2013.[16]  SA Wolf states in his affidavit that Terekhova last visited the United States in January 2020 (nine months before Derkach's designation, and approximately three years before she was indicted) and Derkach's last visit was one month later, in February 2020.  Dkt. 29 at ¶ 21.[17]  The government otherwise provides only vague and potentially contradictory

---

[16] The government does not allege, for example, that Derkach or Terekhova ever intended to move or establish residency here, and the government's allegations do not suggest that they ever had any such intent.

[17] As noted above, the divorce of Terekhova and Derkach was finalized in February 2020, which likely explains why they apparently did not travel to the U.S. together.

allegations about Terekhova's entries into the U.S.  For example, the complaint includes allegations that Terekhova and Derkach were present in the United States for "numerous in-person meetings" with Manela between 2013 and 2019 for the purpose of discussing "the purchase and maintenance of the Defendant Condominiums," Dkt. 1 at ¶ 40, but it describes only four such meetings over five years—two in 2013, one in 2015, and one in 2017—the latest of which would have been at least three years before the sanctions were imposed, and five years before the Derkach Indictment.  *See id.* at ¶ 65.  The government provides no other reasons for their visits.  The government further alleges that Manela "understood that one of the Defendant Condominiums was for Derkach and Terekhova to reside in, and the other would be for their [unnamed] daughter," but provides no basis for that alleged understanding.  Dkt. 1 at ¶ 64.  The government alleges that Derkach, but not Terekhova, "was seen inside one of the Defendant Condominiums on several occasions in or around 2018, when his daughter was living there," and that unidentified employees of the building saw the couple at the condominiums "repeatedly, including living in one of the units for substantial periods of time."  *Id.* at ¶¶ 67, 70.  This last allegation offers no dates nor any hint as to what is meant by "repeatedly" or a "substantial period of time."  Finally, the government alleges that documents from the homeowner's association "reflect that, in December 2020, the listed residents/representatives of the Defendant Condominiums included Derkach's and Terekhova's children, and Derkach's parents," *id.* at ¶ 71, but stops short of alleging when those individuals may have been present in the United States or why it would matter, as none of them is either a claimant, a fugitive, or an owner of any interest in the Claimants or any of the defendant assets.

The apparent infrequency of travel to the United States by Terekhova distinguishes this case from those in which courts have concluded that a foreign national's failure to reenter the

United States is a marked inconsistency from a history of travel that can provide circumstantial evidence of specific intent to avoid prosecution by refusing to reenter.  The court in *United States v. 2005 Pilatus Aircraft*, No. 2:12-cv-00223, 2016 WL 7230209 (S.D. Tex. Jan. 25, 2016), *aff'd* 838 F.3d 662 (5th Cir. 2016), found that the element was satisfied because in the three years preceding the filing of the civil forfeiture case, claimant had entered the U.S., respectively, thirty, fifty-two, and twenty-one times. *Id.* at *1.[18]  The *2005 Pilatus Aircraft* court distinguished the facts in that case from a case in the District of Columbia where the government argued that the fact that the claimant had visited the country previously and then refused to reenter after receiving notice of charges was enough to satisfy the fifth element of § 2466.  That court disagreed with the government, stating "the mere fact that [claimant] has been to this country in the past does not establish that she is refusing to return in order to escape criminal liability." *United States v. Any and all Funds on Deposit, etc.*, 87 F. Supp. 3d 163, 168 (D.D.C. 2015). Similarly, in *$6,976,934.65*, the D.C. Circuit held that a claimant's voluntary departure from the United States years before the bringing of charges was not enough to satisfy § 2466's refusal to reenter element.  554 F.3d at 132.[19]

As noted above, the government's own evidence demonstrates that Terekhova has not traveled to the United States since January 2020, and that while she traveled to the U.S.

---

[18] *See also United States v. $1,152,366.18 in Funds from Bendura Bank AG,* No. 3:21-cv-01134, 2022 WL 2373356 (S.D. Cal. June 30, 2022) (defendant/claimant traveled from Antigua sixty-eight times before learning of criminal charges against him, but not once after, even to attend his mother's funeral).

[19] The facts here are also easily distinguished from cases where the alleged fugitive/claimant has entered into negotiations with the government to gain concessions for agreeing to return to the United States, including negotiating bail, *$671,160.00*, 730 F.3d at 1057, seeking an assurance that claimant will not be arrested upon entry into the United States, *United States v. Real Property Known as 7208 East 65th Pl.*, 185 F. Supp.3d 1288, 1290 (N.D. Okla. 2016), and efforts to negotiate a settlement. *$1,152,366.18 in Funds from Bendura Bank AG*, 2022 WL 2373356, at *4.

occasionally to visit her daughter, her daughter voluntarily left the country in 2021 and has not returned.[20]  Terekhova's last entry into the United States was therefore almost three years before she was indicted.  In addition to the fact that these are mostly allegations, and not admissible evidence, they suggest, at best, nothing more than that one of Terekhova's daughters—who is neither an alleged fugitive nor a holder of any interest in Claimants or the defendant assets— lived in one of the condominiums at some prior time, and that Terekhova traveled to visit her on occasion.  This is simply insufficient to prove that Terekhova refused to enter the United States for the purpose of avoiding criminal prosecution (that are themselves based on the alleged actions of her former husband).  The government's failure to prove this element further requires dismissal of the Motion.

C.    **The Court Should Exercise Its Discretion under the Statute to Decline to Strike the Claims**

Even if the court finds that the government has satisfied all five elements, it can decline to disentitle the targeted claimant and allow the matter to go forward to a determination on the merits.  *See United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck*, 357 F. Supp. 2d 1321, 1328-32 (S.D. Ala. 2005).  Indeed, at least one court has held that a district court has a duty to exercise its discretion and decline to grant a motion to strike under § 2466 if it concludes that the government's civil forfeiture theory appears weak or unfounded.  *Krishnan's Real and Personal*

---

[20]  According to the Wolf affidavit, Terekhova's younger daughter lived in one of the condominiums between "around 2018 and 2020," Dkt. 29 at ¶ 20, and had harbored concerns that government authorities were going to seize the condominiums before "fleeing the United States in August of 2021."  *Id.* at ¶ 16.  The use of the term "fleeing" to describe her voluntary departure from the U.S. is baseless, as there is no evidence suggesting that she did anything other than leave the country where she had lived temporarily while attending school.  SA Wolf also relates a hearsay statement by an unnamed "friend" that when the "friend" informed Terekhova's daughter about the forfeiture case, she replied that she had been expecting such action.  In addition to their lack of foundation, neither of these alleged events has any bearing on whether Terekhova has declined to reenter for the purpose of avoiding prosecution.

*Property*, 469 F.Supp.3d at 497 (denying motion to strike as to one of several assets on equitable grounds because that "claimants have raised substantial questions about the merits of the government's claim").  Because the law favors the adjudication of legal disputes on their merits, particularly in civil forfeiture cases, it would be manifestly unjust to deny Claimants their right to put the government to its proof where millions of dollars in untainted assets are at stake and the government is relying upon a novel and questionable legal forfeiture theory that it has supported with dubious factual allegations and unfounded assumptions.

## V.    CONCLUSION

The government has failed to prove the five essential elements of the fugitive disentitlement statute, and an order of disentitlement would result in manifest injustice. Claimants respectfully ask that the Court deny the Motion and provide give Claimants 21 days to refile their motion to dismiss.

August 28, 2023
New York, New York

Respectfully submitted,

Ryan P. Poscablo
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

Steven R. Welk
Dentons US LLP
4675 MacArthur Court,
Suite 1250
Newport Beach, California 92660
(949) 732-3700

*Attorneys for Claimants*

24