UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiff,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　**MEMORANDUM & ORDER**
　　　　　　　　-against-　　　　　　　　　　　　　　　　　　:　**22-cv-7410 (DLI)(PK)**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
REAL PROPERTY AND PREMISES KNOWN AS　:
432 NORTH OAKHURST DRIVE,　　　　　　　　　:
CONDOMINIUM UNIT 103, BEVERLY HILLS,　　:
CALIFORNIA 90210, AND ALL PROCEEDS　　　:
TRACEABLE THERETO;　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
REAL PROPERTY AND PREMISES KNOWN AS　:
432 NORTH OAKHURST DRIVE,　　　　　　　　　:
CONDOMINIUM UNIT 203, BEVERLY HILLS,　　:
CALIFORNIA 90210, AND ALL PROCEEDS　　　:
TRACEABLE THERETO;　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
ANY AND ALL FUNDS ON DEPOSIT IN STIFEL　:
NICOLAUS & CO. ACCOUNT NUMBER　　　　　:
ENDING IN 9142, HELD IN THE NAME OF 7D　　:
BUSINESS BUREAU INC., AND ALL　　　　　　　:
PROCEEDS TRACEABLE THERETO; and　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
ANY AND ALL FUNDS ON DEPOSIT IN　　　　　:
CITIZENS BUSINESS BANK ACCOUNT　　　　　:
NUMBER ENDING IN 7135, HELD IN THE　　　　:
NAME OF 7D BUSINESS BUREAU INC., AND　　:
ALL PROCEEDS TRACEABLE THERETO　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants *In Rem*.　　　　　　　　　　　:
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

　　　In this civil forfeiture action, Plaintiff, the United States of America (the "Government"), moves to strike the claims of 7D Business Bureau, Inc. ("7D") and 73DT Business Properties, LLC ("73DT") (collectively "Claimants") under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") specifically pursuant to CAFRA's fugitive disentitlement statute, codified at 28

U.S.C. § 2466. *See*, Mem. of Law in Support of Mot. to Strike. ("Mot."), Dkt. Entry No. 28-1. Claimants oppose the Motion. *See*, Mem. of Law in Opp'n. to Gov. Mot. to Strike ("Opp'n"), Dkt. Entry No. 32. The Government replied. Reply Mem. of Law in Support of its Mot. to Strike ("Reply"), Dkt. Entry No. 33. For the reasons set forth below, the Government's motion to strike is granted.

**FACTUAL BACKGROUND**

**I.      Seizure of the Properties**

On December 7, 2022, the Government filed a complaint seeking forfeiture of: (1) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 103"); and (2) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 203"); (3) funds on deposit in Stifel Nicolaus & Co. in account number ending in 9142 in the name of 7D and all proceeds traceable thereto (the "Stifel Account"); and (4) funds on deposit in Citizens Business Bank in account number ending in 7135 in the name of 7D and all proceeds traceable thereto (the "Citizens Account") (collectively, the "Defendants *In Rem*") as: (1) property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957; or (2) property traceable to such property pursuant to 18 U.S.C. § 981(a)(1)(A); (3) property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344; and/or (4) 50 U.S.C. § 1705(a) (International Emergency Economic Powers Act ("IEEPA"));

2

or (5) a conspiracy to commit such offenses pursuant to 18 U.S.C. § 981(a)(1)(C); and/or (6) as property involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, and property traceable thereto pursuant to 31 U.S.C. § 5335(e).  Compl. *in Rem* ("Compl."), Dkt. Entry No. 1 at ¶ 5.  The Government's civil forfeiture complaint arises out of the criminal conduct charged against defendants Andrii Derkach ("Derkach") and Oksana Terekhova ("Terekhova") in the criminal action entitled, *United States v. Andrii Derkach and Oksana Terekhova*, 22-cr-432 (DLI) (the "Criminal Case").

**II.    The Criminal Case**

Beginning in 1998, with the exception of one year from November 2006 to November 2007, Derkach was a member of the Verkhovna Rada, Ukraine's Parliament, and was a politically exposed person under the Bank Secrecy Act.  Compl. at ¶ 34 and ¶ 19(c).  For most of this time, he was a member of the pro-Russia Party of Regions, until recently when he claimed independent status.  *Id.* at 34.  On September 10, 2020, the Department of Treasury's Office of Foreign Assets Control ("OFAC") sanctioned Derkach as an active Russian Agent.  *Id.* at ¶ 35.  On September 26, 2022, a Grand Jury sitting in this district returned an indictment charging Derkach with: (1) conspiracy to violate IEEPA, in violation of 50 U.S.C. §§ 1705(a) and (c); (2) bank fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and (4) engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.  Criminal Case, Indictment, Dkt. Entry No. 3. On January 23, 2023, a Grand Jury sitting in this district returned a superseding indictment adding Terekhova as a defendant and charging her with the same crimes.  *Id.*, Superseding Indictment, Dkt. Entry No. 9.

### III. Acquisition and Maintenance of the Properties and Accounts

In 2013, Derkach and Terekhova purchased and maintained condominiums in Beverly Hills, CA, managing the purchases to conceal Derkach's interest in the transactions. Compl. at ¶ 39. This included the use of a multi-tiered structure of corporate entities, 7D and 73DT, which were set up and managed by a United States-based corporate nominee, Yosef Manela ("Manela"). *Id.* at ¶¶ 39-41. Derkach and Terekhova wired Manela approximately $3.92 million from overseas accounts, $3.2 million of which was used to purchase Unit 103 and Unit 203 on December 6, 2013. *Id.*, at ¶¶ 46-49.

Manela invested approximately $800,000 of the remaining funds in a Morgan Stanley brokerage account held in the name of 7D, which Manela maintained for Derkach and Terekhova's benefit and used to pay expenses on the condominiums, including taxes, homeowners' fees, and utilities. *Id.* at ¶¶ 50-52. Manela later established the Stifel Account in the name of 7D and funded that account with money from the Morgan Stanley account and the client trust account that had received the wire transfers from the overseas accounts. *Id.* at ¶¶ 54-55. Manela also established the Citizens Account in the name of 7D using funds from the Stifel Account and used the Citizens Account to make payments for the maintenance of Unit 103 and Unit 203. *Id.* at ¶¶ 56, 61.

### IV. Ownership of 7D and 73DT

7D is a California corporation Manela incorporated on or about July 25, 2013. Wolf Aff. at ¶¶ 11, 12. Terekhova is 7D's sole shareholder of record. *Id.* 73DT is a California limited liability company Manela organized on or about July 25, 2013. *Id*. at ¶¶ 13, 14. 7D is the sole member of 73DT. *Id.* While Derkach's interest in and control over 7D and 73DT is disputed, there is no dispute that Terekhova exercises control over 7D and 73DT. Mot. at 9; Opp'n at 17.[1]

---

[1] For uniformity and ease of reference, all docket entry page numbers refer to the number assigned by ECF.

4

The Government points to evidence of Derkach's and Terekhova's travels and communications to show both of their involvement in the purchase of, and decision making concerning, the property. Reply at 6-7. Throughout the relevant time period, communications among Manela, Derkach and Terekhova indicate that Derkach maintained decision making authority over the Defendants *In Rem*. *See*, Compl. at ¶¶ 39-53 (Defendant Condos) and ¶¶ 54-63 (Defendant Accounts). Derkach and Terekhova viewed potential properties together before purchasing, misrepresented Derkach's identity after one financial institution rejected their application to open an account, and failed to disclose that Derkach was a politically exposed person or Terekhova's relationship to him as a politically exposed person. *Id.* at ¶¶ 40, 42-45, 50. Also of note is a letter from Manela to both Derkach and Terekhova about the instant action dated December 19, 2022, which strongly suggests Derkach's continued interest in the Defendants *In Rem* past the date of his indictment. Opp'n Ex. A, Dkt. Entry No. 32-2.

On January 18, 2023, Claimants appeared and subsequently, on February 21, 2023, filed claims to the Defendants *In Rem*. Not. of Appearance of Ryan Paul Poscablo, Dkt. Entry No. 9; Claim by 7D Business Bureau, Inc., Dkt. Entry No. 17; Claim by 73DT Business Enterprises, LLC, Dkt. Entry No. 18.

## LEGAL STANDARD

CAFRA confers authority on courts to order disentitlement in civil forfeiture cases. *See*, 28 U.S.C. § 2466. In *Collazos v. United States*, the Second Circuit confronted the disentitlement provision of CAFRA in an issue of first impression. 368 F.3d 190, 192 (2d Cir. 2004) ("*Collazos*"). From the statutory language, the Second Circuit derived five prerequisites that courts must consider when ruling on a fugitive disentitlement motion to wit, that: (1) a warrant or similar process has been issued in a criminal case for the claimant's apprehension; (2) the claimant has

notice or knowledge of the warrant; (3) the criminal case is related to the forfeiture action; (4) the claimant is not confined or in custody in another jurisdiction; and (5) the claimant is deliberately avoiding prosecution in the United States. *Id.* at 198. The Circuit noted that the statute is designed to prevent "the unseemly spectacle recognized . . . of a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." *Id.*, at 200. The Government "bears the burden of establishing the factual prerequisites." *United States v. Technodyne LLC*, 753 F.3d 368, 381 (2d Cir. 2014). However, "even when these requirements are satisfied . . . § 2466 does not mandate disentitlement," and the district court has discretion to make the required findings on the basis of the parties' presentations. *Collazos* at 198; *Technodyne*, 753 F.3d at 382.

**DISCUSSION**

I.   **Derkach**

As a preliminary matter, the Government's motion to strike is predicated on both the fugitive status of Derkach and Terekhova, and their joint control over the Defendants *In Rem*. Reply at 2. Claimants' attempts to construe the motion as premised solely on Terekhova's alleged fugitive status are specious, if not downright misleading. *See*, Opp'n at 14. The parties agree that Terekhova is the ultimate beneficial owner of the Defendants *In Rem*. Resp. to Special Interrog. No. 10, Dkt. Entry No. 30-1. However, Claimants dispute whether Derkach has any ownership interest in the Defendants *In Rem*. *See,* Opp'n at 5. Claimants argue that there is no evidence to support Derkach's stake in the Defendants *In Rem*, especially since Derkach and Terekhova

6

divorced in February 2020. *Id.* at 10. Claimants also attach great significance to the Government's statement that Derkach has no "apparent interest in the property." *Id.* at 14-15.

The Government contends that Derkach had and continues to have interest in and control over the Defendants *In Rem*. Compl. at ¶¶ 64-72. Derkach met with Manela four times, twice in 2013, once in 2015 and once in 2017. *Id.* at ¶ 65. During these meetings, Derkach conveyed the impression that he had decision making authority. *Id.* Statements by Derkach's and Terekhova's daughter indicated that Derkach was an owner of the property, but "her living situation and finances were structured to avoid implicating Derkach or sanctions." *Id.* at ¶¶ 68-69. The Government further contends that the divorce was a sham effectuated for the purpose of concealing Derkach's connection to the Defendants *In Rem* as part of Derkach's and Terekhova's ongoing scheme. Reply at 5-6.

The Court finds that the record establishes that Derkach had and continues to have an interest in the properties. The Government's statements about Derkach's "apparent interest," when read in context, do not constitute a concession that Derkach has no interest in the property, but, instead, are a continuation of the Government's narrative regarding Derkach's and Terekhova's attempts to hide Derkach's interest in the property. *Id.* at 5-6. Even if the Court were to accept Claimants' contentions and find that Derkach has no interest in the property, it would not alter the outcome because the requirements for fugitive disentitlement still are met as to Terekhova.

**II.     Application of Fugitive Disentitlement**

The parties do not dispute that two of the five prerequisites for disentitlement are satisfied. Specifically, the parties agree that a court has issued warrants for Derkach's and Terekhova's apprehension in a criminal case and that the criminal case is related to the instant forfeiture action.

7

*See*, Opp'n at 13 fn. 8 and Reply at 4.  Therefore, the Court focuses its analysis on the remaining three prerequisites contested by Claimants.

        A.      **Notice or Knowledge of the Warrant**

The Court finds that both Derkach and Terekhova have notice and knowledge of their indictment in the criminal case.  The law does not require that the fugitive be served with actual notice or that he have complete knowledge of all the charges against him, rather it requires that there was sufficient information that would have put the claimant on notice that he was called to answer criminal charges in the United States.  *See*, *United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 130 (D.C. Cir. 2009).   Furthermore, it is a "well-established principle that a person is 'considered to have notice of all facts, notice of which can be charged upon the attorney.'"  *Id.* at 128 (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 634 (1962)) (internal quotations omitted).  Claimants dispute whether Derkach and Terekhova have notice or knowledge of their indictment in the criminal case.  Opp'n at 14-20.  However, the record amply supports such knowledge on the part of both Derkach and Terekhova.

        1.      **News Coverage**

Claimants argue that media coverage of Derkach's indictment cannot serve to give Terekhova knowledge of her later indictment.  Claimants correctly note that, "the mere existence of media coverage of the issuance of an indictment is insufficient to satisfy the notice or knowledge element unless accompanied by evidence that the media reached the alleged fugitive defendant wherever he or she was."  Opp'n at 15 (citing *$6,976,934.65, Plus Int.* at 130).  Claimants further argue that the Government presents primarily news coverage of Derkach's indictment, while Terekhova's indictment seemingly generated significantly less interest in the media.  *Id.* at 14 (citing Wolf Aff. at ¶ 6).  While the news coverage of the Derkach and Terekhova indictments was

8

significant and worldwide, the Court does not rely on the news coverage alone in concluding that Derkach and Terekhova have notice or knowledge of their indictment.

### 2. Attorney Notice or Knowledge

Claimants challenge the Government's argument that Derkach and Terekhova have notice or knowledge of their indictment and warrants because Terekhova's lawyers were aware of the warrant. Opp'n at 16-19. Claimants dispute the meaning of an email exchange between Assistant United States Attorney Artie McConnell ("AUSA McConnell") and Claimants' attorney Ryan Poscablo. *Id.* at 16. Mr. Poscablo was asked by AUSA McConnell in an email: "Are you representing [Terekhova] on the criminal case as well?" *Id.* Claimants contend that Mr. Poscablo's response, "I'm your huckleberry. Let me know how I can be of service," "was, at best, merely an acknowledgement that Mr. Poscablo was representing Terekhova in her capacity as the owner of the corporate entities in connection with the civil forfeiture case." *Id*. 16-17. The Court disagrees with this disingenuous argument and finds that the most natural reading of the exchange is that Mr. Poscablo confirmed his representation of Terekhova in the criminal case.

Even if the Court were to accept Claimants' interpretation of the exchange, it is undisputed that counsel for Claimants confirmed representation of Terekhova in the civil case via email. Opp'n Ex. C, Dkt. Entry 32-4. Terekhova's counsel in this civil forfeiture action also requested, and received, copies of her indictment. Mot. at 16 (citing McConnell Decl. at ¶ 6). Thus, the record establishes that Terekhova is aware of her criminal indictment because her lawyers were aware of her it. *See*, *$6,976,934.65, Plus Int*. at 128.

Also relevant is Zaourbek Sagaev's ("Sagaev") role in this case and the timeline of his involvement as an officer of Claimants. Sagaev became the sole officer and director of Claimants sometime between February 2, 2023, when Yosef Manela filed paperwork and February 27, 2023,

9

when Sagaev filed his paperwork.  *Compare*, O'Connor Decl. Ex. C *with* O'Connor Decl. Ex. D; and *compare*, O'Connor Decl. Ex. E *with* O'Connor Decl. Ex. F.  Steven Welk, who represents Claimants in this case, filed the paperwork on behalf of Sagaev on February 27, 2023.  *See*, O'Connor Decl. Ex's D and F.  At the time of that filing, Mr. Welk had notice of the instant forfeiture action, as revealed by his email of January 17, 2023 in which he confirmed representation of Claimants and Terekhova.  Opp'n Ex. 3., Dkt. Entry 32-4.  While there is nothing in the record explicitly indicating who directed Mr. Welk to place Sagaev in charge of Claimants, it strains credulity that he would not have informed Terekhova at least of this change and the reasons for it, namely, her indictment and Manela's resignation.  Indeed, as her attorney, he would have been obliged to do so.  *See*, State Bar of California Rules of Professional Conduct, Rule 1.4 Communication with Clients.  Therefore, the Court can conclude from the facts and circumstances here that Terekhova has knowledge of her indictment.

The Government cites *Rogers v. Palmer* for the proposition that "the law presumes that an attorney communicates notice of any matter within the scope of representation to the client."  Mot. at 18 (citing 102 U.S. 263 (1880)).  Claimants argue that this proposition is inapplicable because in that case, the attorneys "for one of the fraudsters was actively and affirmatively involved in the underlying misconduct."  Opp'n at 17 (citing *Rogers v. Palmer*, 102 U.S. at 267-68).  Claimants' purported basis for distinguishing the case is unpersuasive.  In *Rogers v. Palmer*, the involvement of the attorneys in the scheme was relevant as to *what* knowledge could be imputed to their client, not *whether* that knowledge could be imputed. 102 U.S. 263, 267–68 (1880).  Thus, the proposition that "the law presumes that an attorney communicates notice of any matter within the scope of representation to the client" holds true here.

Claimants also maintain that the statutory forfeiture framework does not "support the proposition that notice of a parallel criminal prosecution to an attorney of a civil forfeiture claimant is sufficient to satisfy the notice or knowledge element, even though the opposite is true." Opp'n at 17. Specifically, while Rule G(4)(b)(iii)(B) of the Supplemental Rules allows the Government to notify the attorney "representing a potential claimant with respect to the seizure of property or in a related investigation, administrative forfeiture proceeding, or criminal case," "there is no corresponding provision that permits notice of criminal proceedings or an arrest warrant to be accomplished through notice to the attorney for a potential civil forfeiture claimant." *Id.* at 17-18. Claimants argue that, in other cases where this method of notice was effective, "the attorney's representation of the alleged fugitive was directly related to the criminal case." *Id.* at 18 (citing *Collazos* at 201; *United States v. Krishana's Real and Personal Property*, 469 F. Supp.3d 481, 488-89 (E.D.N.C. 2020) ("*Krishana's*"), and *United States v. All Right, Title and Interest . . . Trump World Towers*, 2004 WL 1933559, *2 (S.D.N.Y. Aug 31, 2004) ("*Trump World Towers*").

The Court does not read the cases relied on by Claimants to require that an attorney's representation be related to the criminal case. *Collazos* and *Trump World Towers* quite clearly lend no support to Claimants' proposition because, in those cases, the fugitive's knowledge of the warrant was conceded by their lawyers. In *Collazos*, the Second Circuit found that the claimant was aware of warrants because her lawyers acknowledged her awareness. *Collazos* at 201 (fugitive's awareness shown by "[h]er forfeiture counsel's reference to it as an excuse for her failure to appear" and "the unsuccessful efforts of another attorney acting on her behalf in October 2001 to negotiate a surrender.").

Similarly, in *Trump World Towers*, the claimant did not even dispute that he was aware of the arrest warrant. 2004 WL 1933559 at *2 (S.D.N.Y. Aug 31, 2004) ("Barbosa, through his

11

counsel, does not dispute that he is aware that a warrant was issued for his apprehension."). In fact, Claimants' mischaracterization of the notice finding in *Trump World Towers* is puzzling when the court there explicitly stated that notice was not disputed. If there is even an implication that the method of notice was relevant to the decision, the Court cannot find it. Such a wild misreading of a straightforward decision begs the question whether Claimants have intentionally misrepresented the law.

Claimants neglect to mention that, while the attorney in *Krishana's* represented the claimant in the criminal case, *the same attorney* represented the claimant in the forfeiture case. 469 F. Supp.3d at 488-89 (E.D.N.C. 2020). The court found representation in the forfeiture case (as well as the criminal case) relevant to the notice requirement. *Id.* (holding claimant had notice "by virtue of being represented by an attorney in the criminal case . . . and by notice of appearance of the same attorney in the instant case, where the government has included the criminal case indictment as an exhibit to its complaint.") *Id.* Thus, none of Claimants' cited cases support the proposition that an attorney's representation in the civil matter also must be related to the criminal case in order to satisfy the notice requirement.

Notably absent from Claimants' arguments is any assertion that Derkach or Terekhova do not actually know that they have been indicted. *See*, Opp'n at 14-20. The Government's contentions are further supported by Derkach's and Terekhova's pattern of travel and behavior discussed *infra*. Therefore, the Court finds that there is sufficient basis to conclude that both Derkach and Terekhova have notice of their indictments in the criminal case.

**B.     Confinement in Another Jurisdiction**

Claimants dispute whether the Government has shown that Derkach and Terekhova are not subject to confinement in another jurisdiction. Opp'n at 16-17. In support of this contention,

Claimants focus on the case law the Government cites in support of a finding on this element specifically, *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp.2d 30, 40-41 (D.D.C. 2007) ("*$6,976,934.65 Plus Interest*"). *Id.* Claimants take issue with the Government's use of *$6,976,934.65 Plus Interest* to support the assertion that "[c]ourts find this prong to be established when there is no suggestion that the individual at issue is in custody somewhere." Opp'n at 20 (quoting Mot. at 14).

Contrary to Claimants' contention that there is no other case law in accord, the Second Circuit made a nearly identical finding in *Collazos* in affirming the district court's order of disentitlement. There, the Second Circuit found "ampl[e] support[]" in the record that all statutory requirements were satisfied, including the fourth element, where "nothing in the record indicate[d] that [the Claimant] was ever confined, incarcerated, or otherwise unable to travel to the United States of her own volition[.]" *Collazos* at 201. Of course the burden never falls on Claimants to disprove any of requisite elements of fugitive disentitlement. *Technodyne LLC*, 753 F.3d at 381. Much like in *$6,976,934.65 Plus Interest* and *Collazos* nothing in the record here indicates that either Derkach or Terekhova is in detention anywhere. Wolf Aff. at ¶ 19. Therefore, the Court finds that this element is satisfied.

C.  **Deliberate Avoidance of Prosecution**

CAFRA lays out three circumstances by which the Government might show that a criminal defendant has deliberately avoided prosecution, namely by leaving the United States, refusing to enter or reenter the United States or by otherwise evading the jurisdiction of a United States court. *Collazos* at 200; 28 U.S.C. § 2466. "The claimant's intent may be assessed in light of 'the totality of [the] circumstances.'" *Technodyne*, 753 F.3d at 381. Furthermore, "[e]vasion is an expansive concept encompassing any 'craft or strategem . . . to avoid facing up to something.'" *Collazos* at

13

200 (citing *Webster's Third New International Dictionary,* at 786) ("While it is broad enough to include the deliberate flight identified in subpart (A) and the refusal to "enter or reenter" identified in subpart (B), the use of the introductory word "otherwise" indicates that the evasion referred to in subpart (C) reaches beyond these specific examples to myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court where a criminal case is pending against him."). Courts rely on travel history, for example, to determine whether a claimant is evading prosecution. *See, United States v. 2005 Pilatus Aircraft, Bearing Tail No. N679PE*, 838 F.3d 662, 664 (5th Cir. 2016).

Here, the pattern of behavior of Derkach and Terekhova in the years leading up to the sanctions and the indictment and the change in their behavior following the indictment strongly suggest that they are evading criminal prosecution. The record shows that, between the years of 2013 and 2020, Derkach and Terekhova were frequent visitors to the United States. Wolf Aff. at ¶ 20. They purchased properties where members of their family resided and where Derkach and Terekhova indicated they intended to reside themselves. *Id.*; Compl. at ¶ 64.

This contrasts sharply with their behavior following the issuance of sanctions. The same day that Derkach was sanctioned, their younger daughter moved out of the defendant *in rem* condominium in which she was living. *Id.* at ¶ 15. The record establishes that, since the issuance of the criminal indictments, Derkach and Terekhova have not returned to contest or answer the criminal charges. Their failure to return appears to be deliberate in light of their past pattern of behavior and actions during the civil forfeiture proceedings. Therefore, the Court finds that the fifth prerequisite for disentitlement has been met.

14

## **CONCLUSION**

The Government's motion to strike the claims of 7D and 73DT is granted because the Court finds that all prerequisites for fugitive disentitlement have been satisfied. Both Derkach and Terekhova are welcome to contest this forfeiture action by appearing before the Court.

SO ORDERED.

Dated: Brooklyn, New York
       March 25, 2024

/s/
DORA L. IRIZARRY
United States District Judge